UNITED STATES of America, Plaintiff,

v.

James Francis McFADDEN, Defendant.

Crim. No. Cr. 69–152.

United States District Court, N. D. California.

Feb. 20, 1970.

Athearn, Chandler & Hoffman, Richard Harrington, San Francisco, Cal., for defendant.

Cecil F. Poole, U. S. Atty., F. Steele Langford, Asst. U. S. Atty., San Francisco, Cal., for plaintiff.

## ORDER GRANTING MOTION TO DISMISS

ZIRPOLI, District Judge.

James McFadden has been charged by indictment with refusal to submit to induction under 50 U.S.C. App. § 462.[1] He moved to dismiss the indictment pursuant to Rule 12[2] of the Federal Rules of Criminal Procedure because it is based on Section 6(j)[3] of the Selective

---

1. Section 462 in pertinent part reads as follows:

   "Any * * * person charged as herein provided with the duty of carrying out any of the provisions of this title * * *, or the rules or regulations made or directions given thereunder, who shall knowingly fail or neglect to perform such duty, * * * shall, upon conviction in any district court of the United States of competent jurisdiction, be punished by imprisonment for not more than 5 years or a fine of not more than $10,000, or by both such fine and imprisonment, * * *."

2. The pertinent provision of Rule 12 of the Federal Rules of Criminal Procedure provides:

   "(b) The Motion Raising Defenses and Objections.

   "(1) Defenses and Objections Which May Be Raised. Any defense or objection which is capable of determination without the trial of the general issue may be raised before trial by motion."

3. The relevant portion of Section 6(j) is as follows:

   "Nothing contained in this title * * * shall be construed to require any person to be subject to combatant training and service in the armed forces of the United States who, by reason of religious training and belief, is conscientiously opposed to participation in war in any form."

Service Act which is challenged as unconstitutional.

The Selective Service file reflects on its face that the defendant has standing to challenge the constitutionality of Section 6(j): therefore, his motion is "capable of determination without trial of the general issue," which in this case is the failure to report for induction. The court will now grant the motion for the reasons hereinafter stated.

## FACTUAL BACKGROUND

Defendant McFadden applied for conscientious objector status on the grounds that he believes the war in Vietnam is an "unjust" war and that it would therefore violate his conscience to submit to induction. His beliefs are based on his training and belief in the Catholic religion and his schooling at Pope Pius X Seminary College. Although the defendant has foregone his study for entry into the priesthood, he still holds his beliefs as a Catholic and no question of his insincerity has been raised.

The court is not free to decide for itself what is or is not a valid "religious" belief. See United States v. Ballard, 322 U.S. 78, 64 S.Ct. 882, 88 L.Ed. 1148 (1944). However, the question of whether the defendant's beliefs are supported by Catholic doctrine is a matter of fact which the court must, to some degree, review. See United States v. Bowen, Fn. 1 (N.D.Cal. Dec. 24, 1969). The evidence submitted in the selective service file supports the conclusion that many knowledgeable and authoritative members of the Catholic Church consider the defendant's beliefs to be within the framework of the Catholic religion.

Catholic doctrine perceives a difference between wars, classifying some as "just" wars and others as "unjust" wars. See St. Thomas Acquinas, Treatise on Law 72 (Gateway Ed.1949).[4] However, this is not the critical element of defendant's claim for there is no statement by the Catholic Church that the particular war in Vietnam is an unjust war.

The essence of his claim is the role played by one's conscience in Catholic doctrine.[5] This doctrine can be capsulized as follows: There exists a divine law.[6] This law is perceived by man through his conscience.[7] When man detects this law of God which is written in his conscience he must obey its commands.[8] If the laws of man are con-

4. "Every act of war directed to the indiscriminate destruction of whole cities or vast areas with their inhabitants is a crime against God and man which merits firm and unequivocal condemnation." Vatican II, "Pastoral Constitution of the Church in the Modern World," sec. 80 (Dec. 5, 1965).

5. Amicus curiae briefs were submitted by representatives of the following religions: Jewish, Baptist, Lutheran, Presbyterian, Quaker, Disciples of Christ, United Church of Christ, Reformed Church in America, and also the interdenominational National Council of Churches. There are strong suggestions in the briefs that the role ascribed to one's conscience by the various religions are quite similar. There is also some suggestion that religions other than Catholicism also distinguish between wars. However, the issues implied by those suggestions are not before this court.

6. "On his part, man perceives and acknowledges the imperatives of the divine law through the mediation of the conscience. In all his activity, a man is bound to follow his conscience faithfully, in order that he may come to God, for whom he was created." Vatican II, "Declaration on Religious Freedom," ch. I, par. 3.

7. "In the depths of his conscience, man detects a law which he does not impose upon himself, but which holds him to obedience. Always summoning him to love good and avoid evil, the voice of conscience can when necessary speak to his heart more specifically: do this, shun that." Vatican II, "Pastoral Constitution of the Church in the Modern World", Part I, ch. 1, par. 16 (Dec. 5, 1967).

8. "For man has in his heart a law written by God. To obey it is the very divinity of man; according to it he will be judged." Id.
   "Contemplating this melancholy state of humanity, Council wishes to recall first of all the permanent binding force of universal natural law and its all-embrac-

trary to the law of God, as seen through one's conscience, the individual must obey God.[9]

Defendant, relying on the above teaching, states that his religion requires him to obey his conscience and refuse to participate in the Vietnam war. He argues that Section 6(j), while allowing pacifist religious objectors an exemption, puts him to the unconstitutional choice of violating a cardinal principle of his religion or suffering the consequences of jail. Such a claim raises serious constitutional questions.

## FREE EXERCISE OF ONE'S RELIGION

The first issue is whether Section 6(j) of the Selective Service Act places such a burden upon the religious beliefs of the defendant so as to violate the free exercise clause of the First Amendment. Section 6(j) exempts from military service only those persons whose religious beliefs forbid them to participate in "war in any form" (in short, any and all wars). The defendant is therefore made to choose between violating his religious beliefs against entering an "unjust" war, or affirming those beliefs and suffering a possible five-year jail sentence and a possible $10,000 fine. The statute in question puts the most direct burden on the Catholic selective objector—a criminal penalty. See Braunfeld v. Brown, 366 U.S. 599, 605–607, 81 S.Ct. 1144, 6 L.Ed.2d 563 (1961).

Direct restrictions on the exercise of one's religion have been upheld in the past, but those cases dealt with the protection of society's health and morals from affirmative acts required by the religion. For example, in Reynolds v. United States, 98 U.S. 145, 25 L.Ed. 244 (1878), a member of the Mormon faith was convicted of polygamy, and in Prince v. Commonwealth of Massachusetts, 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 (1944), a woman holding the faith of Jehovah's Witnesses was convicted for furnishing her niece, who was under 18 years of age, with religious magazines and permitting her to sell them in public contrary to the child labor laws. See also Cleveland v. United States, 329 U.S. 14, 67 S.Ct. 13, 91 L.Ed. 12 (1946); People v. Pierson, 176 N.Y. 201, 68 N.E. 243, 63 L.R.A. 187 (1903).

However, in the instant case defendant is not being restrained from doing an affirmative act, rather, the Selective Service Act *is commanding him to perform an affirmative act*—participation in a war which his conscience tells him is unjust. This distinction was articulated by Chief Justice Stone thusly: "[C]ompelling the citizen to refrain from doing an act which he regards as moral and conscientious does not do violence to his conscience; but his conscience is violated if he is coerced into doing an act which is opposed to his deepest convictions of right and wrong." "The Conscientious Objector," 21 Colum.U.Q. 253, 268 (1919). See also Cantwell v. Connecticut, 310 U.S. 296, 60 S. Ct. 900, 84 L.Ed. 1213 (1940). If the Selective Service statute does not exempt from its command the Catholic

---

ing principles. Man's conscience itself gives ever more emphatic voice to these principles. Therefore, actions which deliberately conflict with these same principles, as well as orders commanding such actions, are criminal. Blind obedience cannot excuse those who yield to them. Among such must first be counted those actions designed for the methodical extermination of an entire people, nation, or ethnic minority. These actions must be vehemently condemned as horrendous crimes. The courage of those who openly and fearlessly resist men who issue such commands merits supreme commendation." Pastoral Constitution on the Church in the Modern World, December 7, 1965.

9. "Since the right to command is required by the moral order and has its source in God, it follows that, if civil authorities legislate for or allow anything that is contrary to that order and therefore contrary to the will of God, neither the laws made nor the authorizations granted can be binding on the consciences of the citizens, since God has more right to be obeyed than men." Pacem in Terris, ¶ 51, April 11, 1963.

selective objector, then it must run afoul of this prohibition against the State commanding one to act against his conscience.[10] See West Virginia State Board of Education v. Barnette, 319 U. S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943).

The case of Sherbert v. Verner, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963), lends insight into the problem before the court. Sherbert was a member of the Seventh-day Adventist Church which forbade her to work on Saturday, the Sabbath Day of her faith. Because of her adherence to this religious tenet she was fired and could not obtain other employment. The State denied her unemployment compensation because jobs were in fact available if she would forego her religious belief and work on Saturday.

The Supreme Court held that her "conscientious objection to Saturday work constitutes no conduct prompted by religious principles of a kind within the reach of state legislation." *Id.*, at 403. They reasoned that her refusal to work on Saturday was not a threat to health and morals, nor was there a compelling state interest in denying her unemployment benefits.

The heart of the opinion is that her ineligibility derived solely from her religious practice, and that the statute put an unmistakable burden on that practice. The statute "forces her to choose between following the precepts of her religion and forfeiting benefits, on the one hand, and abandoning one of the precepts of her religion in order to accept work, on the other hand." *Id.*, at 404, 83 S.Ct. at 1794.

■ In the case before the court the statute forces defendant McFadden to choose between following the precepts of his religion and going to jail or aban-

doning those precepts in order to avoid jail. Indeed, the case of defendant McFadden is stronger than Sherbert's, for not only is he faced with jail, but if he abandons his conscience he will be put in the position of possibly violating the fundamental precept of his religious belief—the killing of another human being in the cause of an unjust war.

Such a burden upon the exercise of one's religion can have no place in a society built by men and women of all religions and persuasions. And although our history is not free from religious intolerance and persecution, it has always been the ideal of our forefathers to create a country where, as George Washington said: "[t]he liberty enjoyed by the people of these States of worshipping Almighty God agreeably to their consciences, is not only among the choicest of their blessings, but also of their rights."

## EQUAL PROTECTION

■ Inherent in the free exercise clause is the notion that one religious group cannot be favored over another. See Fowler v. Rhode Island, 345 U.S. 67, 73 S.Ct. 526, 97 L.Ed. 828 (1953); Follet v. Town of McCormick, 321 U.S. 573, 64 S.Ct. 717, 88 L.Ed. 938 (1944). This concept is usually recognized as the constitutional requirement of equal protection of the laws. See United States v. Bowen, *supra.*

The statute in question clearly discriminates between those who are opposed to all wars on religious grounds and those who are opposed to particular wars on religious grounds. In effect, this discriminates between the so-called "Peace Churches" and other religions such as the Catholic Church. See United States v. Bowen, *supra*; see also Arguments Before the Court in Welsh v.

---

10. Whether exemption from military service is a right or a privilege is not directly relevant. For regardless of whether Congress can deny such benefit to all, once it grants the exemption to some, it cannot deny it to others based on unconstitution-

al conditions. See Sherbert v. Verner, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963); Speiser v. Randall, 357 U.S. 513, 78 S.Ct. 1332, 2 L.Ed.2d 1460 (1958); United States v. Seeger, 2 Cir., 326 F.2d 846, 851 (1964).

United States, and United States v. Sisson, 38 U.S.L.W. 3273–77 (Jan. 27, 1970).

■ When a law which effects primary rights draws a distinction between classes that distinction must be supported by a compelling state interest. See Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969); Sherbert v. Verner, *supra*, 374 U.S. at 403, 406, 83 S.Ct. 1790; Skinner v. Oklahoma ex rel. Williamson, 316 U.S. 535, 541, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942). If a statute denies equal protection it also violates due process of law under the Fifth Amendment. Bolling v. Sharpe, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed 884 (1954).

■ Section 6(j) may serve some administrative efficiency, however, such an interest cannot be a compelling reason for refusing equal status to Catholic selective objectors. See Sherbert v. Verner, *supra*, 374 U.S. at 407, 83 S.Ct. 1790. United States v. Bowen, *supra* at Fn. 6.

There are a number of other possible justifications for the discrimination against Catholic selective objectors, three of which deserve some discussion. An argument is made that striking the requirement of "war in any form" would result in a substantial loss of manpower. Although the same claim was made when the Court in United States v. Seeger, 380 U.S. 163, 85 S.Ct. 850, 13 L.Ed. 2d 733 (1965), struck out the requirement of belief in a Supreme Diety, such a result has not followed.

■ In the face of such conjecture it is helpful to point out that alternate means are available for resolving any such decrease in manpower. In the area of primary freedoms the government is required to show that no alternate means exist to satisfy the same governmental interest. See McGowan v. Maryland, 366 U.S. 420, 450–452, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961); Braunfeld v. Brown, *supra*, 366 U.S. at 608–609, 81 S.Ct. 1144, 6 L.Ed.2d 563 (1961).

Here numerous alternatives are available. In the coming years there will be a greater number of men available for the draft. By 1980, men of draft age (18–25) will number $18\frac{1}{2}$ million, as compared with $12\frac{1}{2}$ million in 1965.[11]

Another means of meeting any conjectured drop in manpower is revoking college deferments which number at present about 2 million.[12] Furthermore, there are over 2 million men in the active and standby reserves.[13]

These and other means [14] show that the government can satisfy its interest by alternatives other than refusing exemptions to selective religious objectors. Therefore, there can be no compelling state interest in maintaining the present law without such exemptions.

The second argument often recited is that exempting men such as McFadden will endanger the morale of the troops. It is quite obvious that men who are drafted in opposition to deep-seated convictions will not make good soldiers. A spokesman for the Defense Department testifying before the Senate Military Affairs Committee supported such a

---

11. See Chapman, Our Unfair and Obsolete Draft and What We Can Do About It, 7 (1968) citing Bureau of Census.

12. *Id.*, at 17.

13. See Report of the National Advisory Commission on Selective Service, 136–47; 162–3 (1967).

14. One of the most expedient alternatives is one that has proven its merit. Historically the Selective Service System has fluctuated its mental and physical requirements in an ad hoc effort to meet the changing needs for manpower. Chapman recalls, "Thus in mid-1961, with the first wave of the baby boom and before President Kennedy's enlargement of the Armed Forces by nearly 300,000 men, the induction rejections ran as high as 72 per cent, while at the year's end, during the Berlin Crisis, the induction rejection rate went down to 14 per cent. It definitely appears that the man found "unfit" in May would have been quite acceptable in December, depending more on the health of world affairs than on his." *Chapman*, supra at 38, 39.

conclusion: "We are opposed to the repeal of section 5(g) of the Act, mainly because of the fact that the type of people who are conscientious objectors would cause a lot of trouble for the Army." See 3 Harv.Civ.Rts.—Civ.Lib. L.Rev. 1, 46 (1967).

The final argument in support of the government's position is that the extension of the exemption to all selective religious objectors would open the floodgates of spurious claims.

A similar argument was rejected by the Court in Sherbert v. Verner, *supra*, 374 U.S. at 407, 83 S.Ct. 1790, and recently in the area of selective service law it was rejected in United States v. Sisson, 297 F.Supp. 902, 909 (D.Mass. 1969): "*Seeger* cut the ground from under that argument. So does experience. * * * The suggestion that courts cannot tell a sincere from an insincere conscientious objector underestimates what the judicial process performs every day."

Since no compelling state interest exists justifying the invidious discrimination against Catholic selective objectors, section 6(j) violates equal protection and due process of law.

### ESTABLISHMENT OF RELIGION

Defendant also argues that section 6(j) violates the establishment of religion clause of the First Amendment in that it prefers pacifist religions over non-pacifist religions. The Court, in Everson v. Board of Education, 330 U.S. 1, 15, 67 S.Ct. 504, 511, 91 L.Ed. 711 (1947), gave the following description of the establishment clause: "Neither a state nor the Federal Government can set up a church. Neither can pass laws which aid one religion, aid all religions, or prefer one religion over another." This statement was echoed in Epperson v. Arkansas, 393 U.S. 97, 103–104, 89 S.Ct. 266, 270, 21 L.Ed.2d 228 (1968): "Government in our democracy, state and national, must be neutral in matters of religious theory, doctrine, and practice. * * * it may not aid, foster, or

promote one religion or religious theory against another * * *."

For the reasons stated in the above opinions and in United States v. Bowen, *supra*, the court finds that Section 6(j) violates the First Amendment's mandate against the establishment of religion.

An induction order based upon the application of this unconstitutional statute must fall and the indictment based on such order must be and is dismissed.