**Anthony Dennis RAMOS**

v.

**UNITED STATES of America.**

**Civ. A. No. 4420.**

United States District Court,
D. Rhode Island.

Dec. 2, 1970.

---

**1208**

Seth K. Gifford, Providence, R. I., for petitioner.

Lincoln C. Almond, U. S. Atty. for R. I., Joseph C. Johnston, Jr., and Constance L. Messore, Asst. U. S. Attys. R. I., Providence, R. I., for respondent.

## OPINION

PETTINE, District Judge.

### Introduction

This is a petition brought under 28 U.S.C. § 2255 [1] seeking to set aside or

---

1. " § 2255. Federal custody; remedies on motion attacking sentence.
A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the

reduce a two and one-half year sentence which I imposed upon petitioner on October 4, 1968, and which he began serving on August 15, 1969, following his conviction under 50 U.S.C. App. § 462, for refusal to report for induction into the Armed Forces. Petitioner contends first that he was prejudiced by the failure of his local draft board to inform him of his right to be counselled by a Government Appeal Agent and to be advised of administrative procedures in accordance with Local Board Memorandum No. 82 of the Selective Service System; and secondly that since the date of his conviction and sentence the criterion for determination of conscientious objector status under 50 U.S.C. App. § 456(j)[2] has been changed by Welsh v. United States, 398 U.S. 333, 90 S.Ct. 1792, 26 L.Ed.2d 308 (1970) (hereinafter referred to as *Welsh*), and as a consequence his sentence should be vacated or reduced.

### The Facts

Following an indictment for refusing to report for induction, petitioner moved for dismissal on the grounds that the local board acted arbitrarily and capriciously in denying him a Conscientious Objector classification and that inadequate notice was given him regarding the denial of his claim.

An evidentiary hearing was held on the motion and it disclosed that after several student deferments, the petitioner was classified I–A and was mailed a Form SSS 110. Following a series of letters between himself and the draft board, he filed Conscientious Objector Form SSS 150 which resulted in a reopening of his classification and consideration of his C.O. claim on the basis of the statements he set forth therein. I deem it essential to set forth verbatim and in its entirety the petitioner's profession of beliefs, as this is the totality of the evidence bottoming the local board's findings.

### Petitioner's Statement to the Local Board (SSS Form 150)

"As you know many many volumes have been written on the nature of the supreme being; his whereabouts, physical make-up, his affect on our lives. I am not able to express my feelings in such a scholarly manner. Therefore I shall try in as few words as possible to explain my beliefs and feelings in and towards the supreme being.

court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, *or is otherwise subject to collateral attack,* may move the court which imposed the sentence to vacate, set aside or correct the sentence. * * * If the court finds that the judgment was rendered without jurisdiction, or that the sentence imposed was not authorized by law or otherwise open to collateral attack, or that there has been such a denial or infringement of the constitutional rights of the prisoner as to render the judgment vulnerable to collateral attack, the court shall vacate and set the judgment aside and shall discharge the prisoner or resentence him or grant a new trial or correct the sentence as may * * * appear appropriate." [Emphasis added.] There is a conflict among Circuits regarding the availability of § 2255 as a means of vacating sentences on the basis of a change in the law subsequent to conviction. Compare Gray v. United

States. 407 F.2d 830 (5th Cir. 1969); Isaac v. United States, 293 F.Supp. 1096 (D.S.C.1968); United States v. Langford, 315 F.Supp. 472 (D.Minn.1970), and United States v. Kelly, 314 F.Supp. 500 (E.D.N.Y.1970), with Eby v. United States, 286 F.Supp. 387 (N.D.Okla. 1968), aff'd on other grounds. 415 F.2d 319 (10th Cir. 1969), and United States v. Rodgers. 288 F.Supp. 57 (W.D.Okla. 1968). For reasons appearing in the body of this opinion. I uphold the right to use 2255 in this manner.

2. "Nothing contained in this title shall be construed to require any person to be subject to combatant training and service in the armed forces of the United States, who, by reason of religious training and belief. is conscientiously opposed to participation in war in any form. As used in this subsection, the term 'religious training and belief' does not include essentially political, sociological, or philosophical views, or a merely personal moral code. * * * "

'God' is not the same God as is found in most organized religions. (The Quakers and many Eastern religions may be excluded). He does not need a big fancy temple erected to himself. He does not favor one man over another, or one religion over another, or one nation over another. God is not a super Ego sitting on a cloud raining down damnation on us poor weak humans. God is an idea, a force that pervades all existence. He is the laws that make the Earth go around the sun; the laws that make the entire universe exist. He is that special mystical something that enables all cultures, all nations, all religions to create a certain set of rules that they know they should live by in order to exist. The most basic of these rules can be found in the Christian bible, The Koran, in Hindu and Buddhist writings and so on Ad-Infinitum.

1) Thou Shall Not Kill;

2) Love Thy Neighbor As Thyself

3) Do Unto Others As You Would Have Others Do Unto You.

These rules are not only rules that we should live by, they are rules that we must live by if man is going to continue existing.

The world has never completely followed the rules of Gods universe. Thou shall not kill has been amended to— Thou will kill if I the state demand it of you, if not you will be punished.

Love thy neighbor as thyself is now translated as—I love my neighbor as long as he is not Negro, Italian, Irish, Polish, Hungarian, Puerto Rican, German, Catholic, Protestant. The list is endless and may be filled in according to ones own religious and ethnic preferences.

Do unto others as you would have others do unto you has been corrupted into —You better do it to him before he gets a chance to do it to you or else you won't get ahead.

Gentlemen, I submit to you that I cannot and will not live in any manner other than that which I believe is right.

God is not standing on a golden cloud threatening to punish me for doing evil, but he has established a floor plan for a good and just life. It is up to me and man to follow these rules or perish.

I have read and do read the bible, I also read Hindu writings, I know something about the Koran. I can discuss philosophy from Plato to Kant, from Mencius to Sartre. All of these writings are simply tools to help one think but the final answer to the nature of religion and philosophy is personal. I alone must come up with my own personal idea as to the nature of God.

An example would be a translation from the bible, a book that I consider to have many truths between its pages. * * * 'Beware of false prophets which come to you in sheeps clothing but inwardly they are ravening wolves. Ye shall know them by their fruits. Do men gather grapes of thorns or figs of thistles? Even so every good tree bringeth forth good fruit; but a corrupt tree bringeth forth evil fruit. A good tree cannot bring forth evil fruit, neither can a corrupt tree bring forth good fruit. Every tree that bringeth forth not good fruit is hewn down, and cast into the fire. * * *' Because of the personal character of God and Philosophy I must translate this passage in a manner that is significant to me. I will not discuss at this time who the false prophets are but the testimony to there falseness is a world that is filled with 'not good fruit' hate, murder, war, poverty, starvation, all of these things in a world that could be and has all the potential to be just the opposite. I think of myself as 'good fruit' that is to say a person who will not take part in hate, War, murder. A person who if given the chance will attempt to do something about poverty and hunger. A person who does not listen to the false prophets. If the world does not produce more good fruit then it will be cast into a fire of its own making the Hydrogen bomb. Basically the average man is good fruit, but he associates right and wrong with lesser things such as state, nation and

church rather than the greater all encompassing truth of a supreme being.

God is alive! He is alive in me, in man, in the entire complex of my existence. All I have to do is look for him. 'Seek and ye shall find.' It is what we find in our seeking that is of utmost importance." [3]

It should also be noted that the petitioner, in filling out Form 150, signed the following statement as printed on the application:

"I am by reason of my religious training and belief conscientiously opposed to participation in war in any form. I, therefore, claim exemption from combatant training and service in the Armed Forces."

After considering and rejecting his claim, the local board reclassified petitioner I–A.

### Prior Ruling Upon Local Board's Action

All three of the board members testified at the hearing on the motion to dismiss the indictment. One of them (Mr. Theodore S. Knapp) had no recollection of the reclassification meeting; another (Edward H. Zeigler) stated in essence, that the failure of the petitioner to have previously claimed conscientious objector status during the four or five years of his I–A or II–S classification tainted his claim with insincerity and lack of

3. In response to questions regarding the source of his beliefs and their demonstration in his life, petitioner stated:

"My early religious training had a great deal to do with present beliefs, but I would say that my parents were the most influential factor. They are the people who have molded me by subtle talks on mans duty to himself and on the real character of God.

I can also say that my beliefs are and have been affected by everyone that I have ever met for man must interact with other men and something always rubs off.

This first example is a sort of foundation for my present beliefs pertaining to not harming others.

Last year in the Fall term of nineteen sixty six. I was attacked on the street by a young man who had been drafted into the army. This person had never seen me before but I was a likely target because I was the only person on the street. He called me 'nigger' and said that he was going to 'Kick my ass.' I tried to reason with him but he became more angry and began to push and shove me. I did not punch him or try to harm him in any way. When it became apparent that he was going to hurt me. I restrained him by holding him stationary. (I was once a wrestler) The police came and took us to the station here in Carbondale. The young man was questioned about his reasons for attacking me. When questioned if he was angry about being drafted he began yelling how proud he was to fight for freedom and justice. I could only feel pity for this man who obviously did not know what freedom and justice meant. I did not press charges. The young man probably thought of himself as a christian, but it takes more to live with ones concept of God than lip service.

The second episode took place two months ago at a local college dance hall. I had just taken a young lady back to her seat, as I returned to mine a person walked up to me and began to call me a communist and a nigger. He shoved me and pushed me and thumped me. He called me a dirty coward for not wanting to fight in Viet Nam or for not wanting to fight at that moment. He had no reason to believe anything that he said because he had no way of knowing if there was any truth in his statements; he had never seen me before. The only thing that he knew for certain was that I am brown. I had not said or done anything up to this point. He picked up a beer bottle and made ready to strike me. I looked into his eyes and all I could see was hate. I felt very sorry for that man. When he saw that I wasn't going to try and stop him he began yelling louder but he would not strike me. At this point he was grabbed and thrown out by the bouncers.

These two examples I believe point to the fact that I am trying to live according to the rules mentioned in question two. In the first example I restrained the person doing the violence; now after a whole year I realize that even that is not right for me. If I were to have struck that man I would only have proved that I can hate as much as him."

genuineness; and the third (Mr. Ernest Jencks) stated that the petitioner exhibited a conviction based on a code of personal likes and dislikes—personal opinion rather than a religious belief—and that the standard he (the board member) applied for "religious belief" was "association with church groups * * * following of the religion and doctrine." [4]

4. The pertinent testimony of the two board members who recalled petitioner's reclassification and testified about it was as follows: Edward H. Zeigler, chairman of the Board:

"A. I felt he should stay in 1–A period.

Q. Well, what gave you that feeling? That is what I am asking you.

A. Because I didn't think it was a genuine case of conscientious objector. Nothing before that until this came up—not a thing at all over the four or five years he had been reclassified by our Board. There wasn't a single iota of testimony about a conscientious objector all that time. * * *

In this particular case there was nothing in the case as I remember it to indicate anything prior to this letter here, nothing. He was appraised of his classification S–1 and then 1–A. No appeal was taken and then we get this. After we got this we reopened his case to give him all the leeway in the world to reopen his case. We reopened his case from 1–A and considered this and put him back in 1–A. We went overboard on this fellow in my opinion."

Testimony of Ernest Jencks—Board member:

"Q. And what was the basis of your evaluation?

A. The basis for deferment as a conscientious objector is based on religious belief and this file indicates, rather than a conviction based on religious belief, a conviction based on a code of personal like and dislike. A careful reading of the material in that Form 150 indicates a lot of personal opinion, but indicates a comparatively small amount of fixed religious belief in connection with this matter.

Q. And by 'religious belief' what do you mean?

A. I mean religious training, I mean a membership, I mean association with church groups, I mean careful study and following of the religion and doctrine—and I might say I don't mean merely a code of personal conduct."

Following the hearing, this court ruled that it could not be said there was no basis in fact for the board's findings or that it acted arbitrarily or capriciously and denied the motion to dismiss. No appeal was taken from this decision.

*Trial and Appeal*

Following a jury trial and conviction, the petitioner moved for a new trial on

In reviewing the transcript of the hearing and the statements made by the local board members, I can only find Mr. Jencks with precise legal reasons for denying conscientious objector status. No minutes were kept of local board meetings, and as a consequence the basis for Mr. Knapp's vote cannot be determined. I dispose of Mr. Ziegler's reasons as lacking merit, since late maturation of conscientious objector beliefs is clearly recognized. Bouthillette v. Commanding Officer, Newport Naval Base, 318 F.Supp. 1143 (D.R.I. October 9, 1970). Absent any evidence of a local board finding of insincerity, this court must assume that petitioner's sincerity was not in issue, and petitioner having made out a *prima facie* case for conscientious objection, the local board's determination must stand or fall upon their stated reason for rejection of the claim. Witmer v. United States, 348 U.S. 375, 75 S.Ct. 392, 99 L.Ed. 428 (1955). Absent evidence to the contrary, I will assume, as I did at the hearing, that Mr. Knapp rejected petitioner's claim for the same reason as Mr. Ziegler, for otherwise there would have been no basis in fact for the board's action.

It is worth noting that the basis for rejection of petitioner's C.O. claim as articulated by Mr. Jencks is clearly invalid under criteria issued by the Selective Service System itself, subsequent to *Welsh*. Local Board Memorandum No. 107, issued July 6, 1970, provides in part:

"6. The term 'religious training and belief' as used in the law may include solely moral or ethical beliefs. * * *

* * * * *

12. The law does not require that a registrant claiming conscientious objection be a member of a 'peace church' or any church, religious organization, or religious sect, nor does the law require affiliation with any particular group in order to be classified as a conscientious objector."

the ground the court was not impartial, for reasons not pertinent to these proceedings. This was denied and an appeal was taken from the denial of this motion. The appellate court was restricted in its consideration of the record by petitioner's failure to appeal the final judgment of conviction, and as a consequence the case was disposed of on technical grounds[5] without consideration of the classification findings and procedures. Thus petitioner failed to allege, either on the motion to dismiss or during trial, any procedural error by the local board, but at the hearing upon the instant petition has shown that when reclassifying him I–A the board failed to send to him SSS Form 217 (Advice of Right to Personal Appearance and Appeal). He now contends this was a fatal procedural error—an omission of sufficient magnitude to amount to a deprivation of due process properly cognizable in this proceeding.

### Issues Presented

1) Can this petitioner employ 28 U.S. C. § 2255 to challenge his conviction, which he never appealed, on the ground that the criterion for determination of conscientious objector status has been so broadened by subsequent judicial interpretation of existing law (as set forth in *Welsh*) that it would be a miscarriage of justice not to review the classification refusing him conscientious objector status imposed prior thereto?

2) If the answer to question 1 is YES, then is *Welsh* applicable to the case at bar, and if so, should it be given retroactive effect?

3) Can this petitioner employ 28 U.S. C. § 2255 to challenge his conviction on the basis of a procedural error (the failure to send him Form 217) which allegedly denied him adequate notice of his right to an administrative appeal of his reclassification, where this issue could have been raised at trial but was not?

On the view which this court takes, it is unnecessary to consider the last issue presented.

### Conclusions of Law

There are important threshold matters to be resolved before the court can reach the issues presented above. I will now treat each of them separately.

### Welsh and Ramos

Preliminarily it must be decided whether the facts in the instant case would make *Welsh* applicable at all. Factually there is a dramatic parallel in the experiences of this petitioner and Welsh. Both were convicted for refusing to submit to induction following rejection by their local boards of claims that they were conscientiously opposed to participation in war in any form; their exemptions were refused on a finding that there was no religious basis for their beliefs, opinions and convictions, and in their respective statements both Welsh and Ramos expressed deep conscientious scruples against participating in wars in which human beings were killed—both stated they were prepared

---

5. United States v. Ramos, 413 F.2d 743 (1st Cir. 1969).
   "We dislike seeing cases so important to the individuals involved disposed of on technical grounds. On the other hand, if we could overlook the requirement of an appeal from final judgment in one case, we could in all cases and we could similarly disregard other equally important procedural rules." 413 F.2d at 745.

The court continued:
   "We face another procedural barrier to the consideration of [the contention of improper judicial conduct]. Appellant's argument concerning the trial judge's conduct should have been raised by an appeal from the final judgment, rather than appeal from the denial of the motion for a new trial." 413 F.2d at 746.

to go to jail rather than serve.[6] I cannot find points of substantive distinction between the two cases.[7]

### Failure to take an Administrative Appeal

■ Procedurally, however, Welsh appealed the denial of I–O status through the appellate mechanism of the Selective Service System, whereas Ramos did not.[8] Whether this failure bars review of either of the challenges to his conviction which have been raised by petitioner has never been directly decided. In McKart v. United States, 395 U.S. 185, 89 S.Ct. 1657, 23 L.Ed.2d 194 (1969) (hereinafter *McKart*), which was an appeal of a conviction for refusing to report for induction, the doctrine of exhaustion of administrative remedies was held inapplicable to defendant's failure to appeal his I–A classification, where he claimed entitlement to a IV–A (sole surviving son) exemption. Thus, where all administrative remedies were closed at the time of trial (i. e., resort to the courts was not premature), and where defendant's right to the claimed status was a pure question of statutory interpretation requiring no further development of a factual record and no particular administrative expertise or discretion, and finally where application of the exhaustion doctrine could deprive defendant of a successful defense to the criminal prosecution, exhaustion was held to be improper. This court can conceive of no good reason for a different rule regarding exhaustion in 2255 cases than in direct appeals.[9] Therefore in applying the principles of *McKart* to the case at bar, I hold that Ramos' failure to appeal his I–A classification does not bar judicial review. Here, petitioner's avenues of administrative appeal were concededly closed at the time of trial and he could not open them again, no matter how strongly he might want to do so. Therefore a challenge to his classification, if raised at trial, would not have been premature and a *fortiori* is not premature now. Furthermore, the local board's denial of petitioner's C.O. claim was based upon the absence of a connection to organized religion. As stated by Mr. Jencks, this was a simple question of what degree of participation in organized religion the statute required and was not a matter over which he exercised any judgment or discretion. Nor was there any possibility of expansion of the factual record or of additional adminis-

---

6. In an undated letter received by his local board on August 16, 1967, petitioner stated the following:

"I am weary and before I have a nervous breakdown I need a short respite from you and your offices. The enclosed request [a request for an undergraduate student deferment] does not in any manner infer that I have given up my request or quest for Conscientious objector status. I am a senior 23 years of age. If I don't see or hear from you by the time I'm 24 I may keep my sanity. It does not seem possible that you people could have read all those typewritten pages and contacted the 20 or so references who lived in all parts of the country in just one week and then turned down my request. I had assumed that the 1A that I received was not an answer on my status as C.O. hence I ignored it. If you will tell me how to appeal I will do so immediately.

Mrs. Campbell martyrdom is not my cup of tea but if necessary I will go to jail. I am an artist a painter (not a fighter or destroyer) and I grow weary of this continual harassment."

7. I do not deem their point of dissimilarity of telling importance—Welsh struck the word "religious" in filling out his C.O. application, whereas Ramos did not.

8. A registrant can request a personal appearance before his local board to contest his classification or to provide new or additional information, as a basis for requesting reconsideration of his classification. 32 C.F.R. §§ 1624.1; 1624.2. A right of appeal to the state appeal board is the next step in the process. 32 C.F.R. § 1625.13. Appeal to the national appeal board will then lie if the state board's decision was not unanimous. 32 C.F.R. § 1627.3.

9. See *Kelly, supra*, 314 F.Supp. at 503.

trative determinations which could aid judicial review.[10]

Finally, application of the exhaustion principle here would prevent the assertion of two claims which could possibly result in petitioner's release from prison. The Selective Service System's interest in exhaustion does not outweigh the severe burden which it would place upon petitioner, at least where, as here, allowing all registrants similarly situated to bypass the administrative appeal process would not seriously impair the Selective Service System.[11] As has been noted elsewhere, preventing registrants from attacking their classifications in subsequent criminal prosecutions is completely ineffectual as a deterrent to deliberate bypass of administrative appeals since few registrants are aware of the exhaustion doctrine and its effect. Lockhart v. United States, 420 F.2d 1143, 1154 (9th Cir. 1970) (dissenting opinion).

In reaching this determination, I have been mindful of the Court's careful effort in *McKart* to acknowledge that conscientious objector claims in general are not among those which involve pure questions of statutory interpretation.[12] However, the instant case is analogous to United States v. Eades, 430 F.2d 1300 (4th Cir. 1970), in which the defendant (who was tried and convicted before the decision in *Welsh*) was denied a I–O classification solely because he failed to claim belief in a Supreme Being. Quoting the holding of *McKart*, the court excused defendant's failure to exhaust his administrative appeals, since " * * * all administrative remedies were closed at the time of trial, the defense based on construction of the statute was essen-tial to the defendant's case, and there was no disputed issue other than that of statutory construction." 430 F.2d at 1302. Furthermore, United States v. Zmuda, 423 F.2d 757 (3rd Cir. 1970), does not require a contrary result because in that case the defendant deliberately failed to employ the administrative process even to determine the basis for the local board's denial of C.O. status. Thus, the trial court's need for factual development and the possibility that the board's action was factually inspired (e. g., they may have reached a judgment that the registrant was insincere) placed that case in a fundamentally different posture from the one before me. Compare United States v. Davila, 429 F.2d 481, 484 (5th Cir. 1970) and Lockhart v. United States, 420 F.2d 1143, 1145–1146 (9th Cir. 1970) (*en banc*).

I draw further support for excusing petitioner's failure to exhaust from a footnote remark in Gutknecht v. United States, 396 U.S. 295, 90 S.Ct. 506, 24 L.Ed.2d 532 (1970), in which the Court expressed its holding in *McKart* as follows:

"The doctrine of exhaustion of remedies, we held, was inapplicable where the question sought to be raised was solely one of statutory interpretation, *id.*, at 197–199, 89 S.Ct. at 1664–1666 and where application of the doctrine would serve to deprive a criminal defendant of a defense to his prosecution, *id.*, at 197, 89 S.Ct. at 1664."

396 U.S. at 300 n. 3, 90 S.Ct. at 508.

The case presented by petitioner clearly falls within this broad view of the holding in *McKart*. It must also be noted that Dunn v. United States, 383 F.2d

---

10. The conditions for supplementing the record by the registrant were not met in this case. 32 C.F.R. §§ 1626.12, 1626.24.

11. See *McKart, supra,* 395 U.S. at 200, 89 S.Ct. 1657, 23 L.Ed.2d 194.

12. "Conscientious objector claims * * * would appear to be examples of questions requiring the application of expertise or the exercise of discretion. In such cases, the Selective Service System and the courts may have a stronger interest in having the question decided in the first instance by the local board and then by the appeal board, which considers the question anew. * * * " 395 U.S. at 198 n. 16, 89 S.Ct. at 1665. " * * * ministerial or conscientious objector claims * * * may well have to be pursued through the administrative procedures provided by the Selective Service laws." 395 U.S. at 201, 89 S.Ct. at 1666.

357 (1st Cir. 1967) cert. denied, 390 U.S. 982, 88 S.Ct. 1103, 19 L.Ed.2d 1280 (1968), which held that a knowing failure to exhaust one's right of appeal of a I–A classification precludes judicial review of the classification, antedated *Mc-Kart*, which certainly robs *Dunn's* absolute language of much of its vitality.

Although not necessary to this decision, I find another independent basis for not requiring exhaustion here. United States v. Davis, 413 F.2d 148 (4th Cir. 1969), held that a local board's noncompliance with Selective Service System Local Board Memorandum No. 82 presented exceptional circumstances excusing a registrant's failure to appeal administratively. L.B.M. 82, issued March 6, 1967, required local boards to inform all registrants placed in I–A, I–A–O, or I–O classifications of the name of their Government Appeal Agent and his availability for obtaining legal advice, including that regarding his right of appeal. SSS Form 217, which was clearly never mailed to petitioner, is the document which notifies the registrant of his right to an Appeal Agent. I agree with the following reasoning of the court in *Davis:*

> "We hold that where a registrant has not been afforded by the board information or assistance required to be given him to assist him in deciding whether to appeal administratively, he is not subsequently barred in a criminal prosecution from questioning the classification.
>
> Since [defendant] was denied the assistance and advice that he was entitled to have under Local Board Memorandum 82, we think the government is estopped to insist that his failure to do the very thing he should have been advised about (appeal) bars his right to judicial review of his classification."

413 F.2d at 151.

Thus I find that petitioner's failure to appeal administratively his I–A classification would not prevent judicial cognizance of his present allegations if he were now defending a criminal prosecution, and I see no reason for a different result where, as here, petitioner is collaterally attacking his conviction. Cf. United States v. Kelly, 314 F.Supp. 500 (E.D.N.Y.1970) (hereinafter *Kelly*).

*Failure to Appeal his Conviction*

On the cited authority and the reasoning employed in *Kelly*, I find that petitioner's failure to appeal his conviction should not foreclose this collateral challenge to that conviction.[13]

Having decided that petitioner's failures to appeal do not bar this challenge to his conviction, I now consider the second of the enumerated issues—the retroactivity of *Welsh*.

*Retroactivity*

The opinion of Judge Zavatt in *Kelly* exhaustively treats the retroactivity question. It would serve no useful purpose to reiterate his well-reasoned analysis of the law. I adopt his reasoning, and in applying it to the case at bar, I find that it justifies the retroactive application of *Welsh*. Furthermore, I must conclude that had this Supreme Court decision existed when the petitioner's original motion to dismiss was heard, I would have granted the same[14] and dismissed the indictment.

The path to this conclusion was not without its obstacles. The United States Supreme Court reversed the conviction in *Welsh* because of its fundamental inconsistency with United States v. Seeger, 380 U.S. 163, 85 S.Ct. 850, 13 L.Ed.2d 733 (1965) (hereinafter *Seeger*), which held that § 6(j) of the Universal Mili-

---

13. Though this is not a case in which the statute itself has been declared void (as in *Kelly*), but rather the interpretation of the statute has been radically altered, I think that the fundamental principle of fairness to petitioner is the same.

14. The petitioner's attack upon the classification by way of a motion to dismiss the indictment is considered by this court to be an appropriate procedure. See United States v. Seeley, 301 F.Supp. 811, 812–813 (D.R.I.1969).

tary Training and Service Act [15] exempts any person whose sincere and meaningful belief " * * * occupies a place in the life of its possessor parallel to that filled by the orthodox belief in God of one who clearly qualifies for the exemption." 380 U.S. at 166, 85 S.Ct. at 854. It could not be clearer that *Seeger* still emphasized the *religious* content of the requisite beliefs, however,[16] and the elimination of that ingredient, to me, markedly distinguishes *Welsh* from the prior interpretation contained in *Seeger*.[17] Mr. Justice Harlan, concurring in the result in *Welsh* on the ground that § 6(j) violates the First Amendment's Establishment Clause, vigorously denounced " * * * the liberties taken with the statute," and pointedly stated, 398 U.S. at p. 345, 90 S.Ct. at p. 1799:

> "Today the court makes explicit its total elimination of the statutorily required religious content for a conscientious objector exemption. The prevailing opinion now says: 'If an individual deeply and sincerely holds beliefs which are purely ethical or moral in source and content but which nevertheless impose on him a duty of conscience to refrain from participating in any war at any time [emphasis added],' he qualifies for a § 6(j) exemption."

And later he reiterated his distaste for the majority opinion:

> "The court today, however, in the name of interpreting the will of Congress,

has performed a lobotomy and completely transformed the statute by reading out of it any distinction between religiously acquired beliefs and those deriving from 'essentially political, sociological, or philosophical views or a merely personal moral code.' "

398 U.S. at 351, 90 S.Ct. at 1802.

It may be said that *Welsh* posits upon the inferior courts a legal concept of religion that demands no basis or belief in God. It is now a subjective test virtually immune from attack, except in the narrow circumstances set forth by the Court:

> "The two groups of registrants which obviously do fall within these exclusions from the exemption are those whose beliefs are not deeply held and those whose objection to war does not rest at all upon moral, ethical, or religious principle but instead rests solely upon considerations of policy, pragmatism, or expediency." [Emphasis added.]

398 U.S. at 342–343, 90 S.Ct. at 1798.

Ramos falls within the ambit of so broad a spectrum. Though it may be argued that this is not a new standard, it is, nevertheless, such an extension of *Seeger* as to require retroactive application to prevent gross injustice.[18] Three factors are set forth in Desist v. United States, 394 U.S. 244, 89 S.Ct. 1030, 22 L.Ed.2d 248 (1969) (hereinafter *Desist*), and discussed in *Kelly*, to be considered in determining whether a given ruling is to be accorded retroactive effect. As stated

---

15. See note 2, *supra*. At the time *Seeger* was decided, the statute required "religious training and belief * * * in a relation to a Supreme Being."

16. After noting the clear Congressional intent to re-enact substantially the same provisions as the 1940 Selective Training and Service Act, the court continued:
   "Under the 1940 Act it was necessary only to have a conviction based upon *religious* training and belief; we believe that is all that is required here. Within that phrase would come all sincere *religious* beliefs which are based upon a power or being, or upon a faith, to which all else is subordinate or upon which all else is ultimately dependent."

(Emphasis added.)
380 U.S. at 176, 85 S.Ct. at 859.

17. Other courts have already recognized that the expansive definition contained in *Welsh* requires reversal of some convictions. See Aquilino v. Laird, 316 F. Supp. 1053 (W.D.Tex.1970), United States v. Coffey, 429 F.2d 401 (9th Cir. 1970).

18. I could find no reported opinion which has yet considered this question. In Quinn v. Clifford, 3 SSLR 3282 (N.D. Cal.1970), Judge Zirpoli commented:
   " * * * no court has dealt with the so-called retroactivity of [the *Welsh*] standard."
3 SSLR at 3283.

in *Desist,* the most important factor is the purpose to be served by the new rule.[19] It is clear that the very essence of this consideration is " \* \* \* the fairness of the trial—the very integrity of the fact-finding process." Linkletter v. Walker, 381 U.S. 618, 639, 85 S.Ct. 1731, 1743, 14 L.Ed.2d 601 (1965).

It is true that *Welsh* did not involve, as did *Kelly* and the majority of the other cases upholding retroactivity of criminal rules, a procedural rule which presents the possibility of admission of unreliable evidence.

"Generally speaking [the cases upholding retroactivity] are characterized by a flaw in the prior procedure (subsequently invalidated) of such magnitude that the facts upon which the prior convictions were based could not be said to be reliable; the guilt or innocence of the accused was in serious doubt as a result of the invalidated procedure. \* \* \* It is important to note that the Supreme Court cases in which retroactivity was applied looked only to the purpose of the rule. \* \* \* It can be said that, in those cases in which the purpose of the new rule was to correct a flaw in prior procedure seriously affecting the determination of guilt of the accused, the court has applied its decision retroactively without considering either the reliance or burden factors. \* \* \* "

*Kelly, supra,* 314 F.Supp. at 507–508.

Decisional examples of the application of this sense of fairness run the gauntlet from the right to counsel in state felony cases, to a right to a trial transcript for use on appeal in state criminal cases, to the voluntariness of confessions, and to the right to counsel at arraignments and preliminary hearings.

None of the evidence before this court at the time of petitioner's conviction was improperly admitted, under *Welsh.* But the unfairness of petitioner's trial is even more fundamental. As stated by Judge

Zirpoli in Andre v. Resor, 313 F.Supp. 957 (N.D.Cal.1970), in which he applied *Gutknecht, supra,* retroactively:

"The more directly the rule in question serves to preclude the conviction of innocent persons, the more likely it is that the rule will be afforded retrospective application."

313 F.Supp. at 960.

The fact that petitioner is or was not a member of a religious organization is an impermissible basis for rejection of his C.O. claim, under *Welsh.* It is senseless to deny petitioner relief merely because he happened to be prosecuted before the decision in *Welsh,* when his conviction rests upon a statutory interpretation which the Supreme Court has since determined to be incorrect. Cf. Foster v. United States, 320 F.Supp. 646 (D.Conn. June 30, 1970). Consequently his imprisonment on that ground is unfair. Or, expressed another way, since the guilt or innocence of the accused is affected and is related to the very findings made by the local board, Ramos falls within those cases which have given retroactive effect to judicial decisions.[20]

*Applicability of Welsh*

■ It is essential to the present discussion to note that Ramos never waivered from his contention that his was a religious conscientious objection. Since he has never contended, as did Welsh, that his views were not religious but were strongly-held ethical beliefs, the government argues that Ramos cannot now claim the shelter of the *Welsh* holding that a conscientious objection need not be a "religious" one, in the traditional sense, but that he must rest upon the board's findings that he did not satisfy the pre-*Welsh* standard of religious conviction.

It appears to me that the government's argument must fail for several reasons. First, not to apply the *Welsh* teachings will result in a gross miscarriage of jus-

---

19. See United States v. Vallejo, 312 F. Supp. 244, 247 (S.D.N.Y.1970).

20. For an excellent review of the case law on retroactivity, see *Kelly, supra,* at 505–509.

tice by preventing the petitioner from challenging a conviction based on a decisional standard which has been so extended as to negate the local board's reasoning for denying conscientious objector status—i. e., insufficient religious basis. He simply had no control over the local board's decision to characterize his beliefs as non-religious, and reject his claim on that basis.

Unwittingly, Mr. Ernest Jencks, in stating the board's reasons for denial (see n. 4, *supra*), fell squarely into the *Welsh* doctrine. I find he interpreted Ramos as espousing a "conscience spurred by deeply held moral, ethical, or religious beliefs" (*Welsh, supra,* 398 U.S. at 344, 90 S.Ct. at 1798) and there is nothing in the record to dispute that it was not such as to give him "no rest or peace" (id.) if he allowed himself to become part of the military establishment. On the contrary, the totality of the evidence preponderates in his favor.

Secondly, though Ramos used the word "religion," by not striking it from the printed Form 150 as did Welsh, this cannot be overemphasized to the sacrifice of his interpretation of religion as a code of conduct—an idea—an all compelling ethical force. Simply speaking " * * [a] conscience spurred by deeply held moral, ethical, or religious beliefs * * [which] give [him] no rest or peace if [he] allowed [himself] to become a part of an instrument of war." *Welsh, supra,* at 344, 90 S.Ct. at 1798. To use his words, military participation is likened to being a "bad fruit" that will be cast into the fires of hell.

In short, the local board simply applied the wrong standard and I find that petitioner is not foreclosed from pressing this collateral attack on his conviction. Furthermore, I find compelling reasons to retroactively apply the teachings of *Welsh, supra,* which, if it did not in effect eliminate the statutorily required religious content for a conscientious objector classification, at least interpreted the criterion so expansively that there would be no basis in fact for the local

board's action if petitioner's case were before me for the first time today.

Accordingly, I rule that the petitioner's motion is granted and the remaining unserved portion of the sentence imposed on the 4th day of October, 1968 is hereby vacated.