**UNITED STATES**

**v.**

**John E. FARGNOLI.**

**UNITED STATES**

**v.**

**Joseph Rinaldo FARGNOLI, Jr.**

**Ind. Nos. 7571, 7569.**

United States District Court,
D. Rhode Island.

Feb. 23, 1973.

Lincoln C. Almond, U. S. Atty., Constance Messore, Asst. U. S. Atty., Providence, R. I., for plaintiff.

Marvin M. Karpatkin, Steven Delibert, Melvin L. Wulf, New York City, Seth K. Gifford, Providence, R. I., for defendants.

## MEMORANDUM AND ORDER

PETTINE, Chief Judge.

These Selective Service cases are before the court on remand from the United States Court of Appeals for the First Circuit ". . . for a determination whether [as to each defendant], at the time he refused induction, his beliefs were such as to entitle him to classification as a conscientious objector under the *Welsh* standard but not under the prior standard." United States v. Fargnoli, 458 F.2d 1237 (1st Cir. 1972).

The defendants appealed their convictions of refusing to submit to induction in violation of 50 U.S.C. App. sec. 462(a). At their trial, each defendant urged his entitlement to conscientious objector status as of the time of his respective refusal to be inducted though each presented his claim of conscientious objection a substantial period of time after such refusal.

■ Ordinarily, a conscientious objector claimant must exhaust administrative remedies before raising a claim before a court. Recognizing the special circumstances of these cases, the Court of Appeals held that the case of Welsh v. United States, 398 U.S. 333, 90 S.Ct. 1792, 26 L.Ed.2d 308 (1970) applied retroactively and that

"[A] registrant who can demonstrate that at the time of refusing induction he held beliefs which did not qualify under then-existing law but do qualify under *Welsh* is not barred from raising that claim by failure to have presented the claim to his local board." 458 F.2d at 1240.

The Court of Appeals assigned to the District Court rather than the draft board the task of determining whether, at the time each refused induction, the defendants did not qualify under pre-*Welsh* standards but did qualify as conscientious objectors under *Welsh*. As the Court of Appeals said, "A finding in the [defendant's] favor will both excuse his failure to exhaust and constitute a defense to the criminal charge, in which case the [defendant] shall be acquitted." 458 F.2d at 1240.

It is apparent that the "pre-*Welsh* standards" referred to are the standards the Selective Service System would have applied to the defendants in their interpretation of United States v. Seeger, 380 U.S. 163, 85 S.Ct. 850, 13 L.Ed.2d 733 (1965). As the Court of Appeals recognized, the standards applied by the Selective Service prior to *Welsh* were "a begrudging version of *Seeger*," that is:

"To be entitled to a classification as a conscientious objector, the registrant's objection to military service must be by reason of religious training and belief. The definition of 'religious training and belief' comports with a standard or accepted under-

standing of the meaning of religion in American society. . . . However, the use of the word ['religion'] in connection with the selective service law was not intended to be inclusive of morals or of devotion to human welfare or of policy of government." L. Hershey, D. Omer and E. Denny, Legal Aspects of Selective Service 12 (1969 ed.) (manual for government appeal agents), cited at 458 F.2d at 1239.

It is instructive to note that Mr. Justice Harlan, concurring on constitutional grounds in *Welsh*, thought that the proper interpretation of the statute allowing conscientious objection after *Seeger* was as follows:

> "Congress was not embracing that definition of religion that alone speaks in terms of 'devotion or fidelity' to individual principles acquired on an individualized basis but was adopting, at least, those meanings that associate religion with formal, organized worship or shared beliefs by a recognizable and cohesive group." 398 U.S. at 353, 90 S.Ct. at 1803.

These, then, are the applicable legal standards.

By agreement, the evidence of the previous trial and hearings shall constitute the factual basis for this Court's determination of the issues before it. Each defendant shall be discussed separately.

### Findings of Fact

#### John Fargnoli

On November 6, 1968 the defendant reported for induction and in the course of the processing procedures he was asked to take the customary step forward signifying induction. He refused and the indictment in this case ensued. It was returned on May 15, 1969.

Prior to the defendants' trial the United States Supreme Court rendered its decision in Welsh v. United States, *supra*, 398 U.S. 333, 90 S.Ct. 1792, 26 L. Ed.2d 308 and on January 11, 1971 Mr. John Fargnoli for the first time contest-

ed his classification by submitting to his draft board a completed Form 150. He requested the Board to re-open his classification and consider his conscientious objection. This belated action is best explained in his own words—

> "Since conscientious objection had, until Welsh v. U. S., been permitted only on the grounds of religious training and belief, I never applied for conscientious objector status or requested SSS Form 150. . . . With Welsh v. U. S. now decided in favor of permitting purely ethical or moral beliefs, and while my own case is still awaiting trial, I am now applying under the expanded interpretation."

The Board's only action was an insouciant forwarding of the information to the United States Attorney.

At the non-jury trial the defendant was permitted to introduce the Form 150 and other documentary and testimonial evidence as to his beliefs. The trial court refused to retroactively apply the *Welsh* doctrine, thus giving no consideration to the defendant's conscientious objection. A judgment of conviction was entered.

As of the time Mr. John Fargnoli refused induction he had been for some time markedly expressing his beliefs as to human existence, war, and killing in letters, journal entries, and an article published in the Wesleyan Argus for April 19, 1968, entitled "Channeling Revisited." From these, together with the testimony taken at the trial and the filed Form 150, the evolving perfection of a matured and profoundly searching conscience is revealed. What is left to this court is the sole task of determining the relevancy of defendant's beliefs as of November 6, 1968 to the conscientious objector exemption fashioned in Welsh v. United States, 398 U.S. 333, 90 S.Ct. 1792, 26 L.Ed.2d 308 (1970) as against the prior standard expressed in United States v. Seeger, 380 U.S. 163, 85 S.Ct. 850, 13 L.Ed.2d 733 (1965).

In a manner best understood by him he expresses ". . . an ethical, philo-

sophical system . . ." which constitutes the basis of his life. In essence he terms it the "holiness of human life."

From it all it is manifest to this court he was indeed conscientiously opposed to participation in all wars execrating the taking of human life under any circumstances. The sincerity and non-religious basis of his convictions are obviously the culmination of extensive philosophical readings, which are, as he himself recognized, a departure from the norms of the accepted understanding of religion. He flatly stated he was opposed to all wars and terms as "sacramental" the "ongoingness" of human life. He states in his Form 150—

". . . Life especially human life— possessing the mystery light of consciousness which distinguishes it from all other forms of life—*is a holy presence. Human life is sacred* and its preservation *is the first* and *most important moral* task of Man . . . . Before all else, Man's duty is to hold sacred the lives of those who share this world with him. This obligation is an abiding one; it holds no matter what religion a man professes, as well as if he professes none at all; and *it extends throughout all human activities, from the way we carry on our daily existence, to the way we settle international disputes.* The greatest moral wrong of which man is capable is the treating of another human being as a non sacred object: an anonymous thing, a faceless non-human."

"It is because of the indubitable experiencing of Being, because of our existential obligation to love, that we must treat every person as something sacred, as an end in himself—completely—and not as a means to any other end. Not to do so is to violate our very Being, and to deprive another person of his human-ness. One cannot simply regard another person with an I'll-do-with-you-what-I-please attitude. Ultimately, we cannot decide *to take someone's life. We can-*

*not assume the right to end some one's participation in Being, ultimately the basic human right is the right to live.*"

Defense counsel pointed out other expressions of the defendant that bear directly on the issues before this court:

"Thus, there is no legal way for atheists, agnostics, non-sectarian believers, or humanists, to execute their refusal to participate in military service and/or war. The guarantee of religious freedom does not apply to them.

\* \* \* \* \* \*

Thus, the category of conscientious objection as defined by the Selective Service Act is irrelevant to my position. It was never designed to include me, or others like me." (Def. Ex. C)

The government argues that the defendant negates his own sincerity in a letter he wrote on June 11, 1968 to a Rev. Albert G. Perry, Defendant's Exhibit B, in which he stated:

"To defend one's country in time of clear national danger is a form of self-defense and is clearly different from actively pursuing a course which one knows will result in violent engagement. If Dean Rusk's 50 billion Chinese armed with nuclear missiles would come up Narragansett Bay, then of course I would fight—as perhaps I would have fought in World War II—but I will not knowingly concede to government the right (they currently have the power) to pursue warfare at their discretion, depending on their interpretation of the needs and aims of our foreign policy."

### Welsh and Seeger

The universal Military Training and Service Act, 62 Stat. 612 (1948) as amended, Military Selective Service Act of 1967, 50 U.S.C. App. sec. 456(j) (Supp. IV 1969) required that opposition to war must derive from "religious training and belief" but not from "essentially political, sociological or philosophical views, or a merely personal

moral code." The *Seeger* court in 1965 broadened the definition of "religious belief" by holding that a belief sincerely held which occupied "a place parallel to that filled by the orthodox belief in God" satisfied the statutory requirement. In doing this, however, rejecting the "orthodox," it nevertheless retained religion as a necessary premise for such belief. This is clear from its statement that,

> "Under the 1940 Act it was necessary only to have a conviction based upon *religious* training and belief; we believe that is all that is required here. Within that phrase would come all sincere religious beliefs which are based upon a power or being, or upon a faith, to which all else is subordinate or upon which all else is ultimately dependent."

As was noted earlier, the Selective Service gave a begrudging interpretation of *Seeger*. In 1968 the *Welsh* court did indeed perform a "lobotomy" by "reading out of [the statute] any distinction between religiously acquired beliefs and those deriving from 'essentially political, sociological, or philosophical views or a merely personal moral code'." Mr. Justice Harlan's concurrence in the majority opinion, 398 U.S. at 351, 90 S.Ct. at 1802.

The *Welsh* court stated at page 340, 90 S.Ct. at page 1796:

> "If an individual deeply and sincerely holds beliefs that are purely ethical or moral in source and content but that nevertheless impose upon him a duty of conscience to refrain from participating in any war at any time, those beliefs certainly occupy in the life of that individual 'a place parallel to that filled by . . . God' in traditionally religious persons. Because his beliefs function as a religion in his life, such an individual is as much entitled to a 'religious' conscientious objector exemption . . . as is someone who derives his conscientious opposition to war from traditional religious convictions."

And at pages 342–343, 90 S.Ct. at p. 1798 went on to hold:

> "The two groups of registrants that obviously do fall within these exclusions from the exemption are those whose beliefs are not deeply held and those whose objection to war does not rest at all upon moral, ethical, or religious principle but instead rests solely upon considerations of policy, pragmatism, or expediency."

In keeping with these teachings and the mandate of the Court of Appeals the acquittal of John Fargnoli as he sets forth in his brief requires proof by a "fair preponderance" of the evidence, 458 F.2d 1237 at 1240, that "he was conscientiously opposed to participation in all wars, that his beliefs were sincerely held, and that his beliefs sprang from 'non religious' moral and ethical beliefs, but not from 'religious training and belief' [which] comports with a standard or accepted understanding of the meaning of religion in American society: Hershey, Omer and Denny, Legal Aspects of Selective Service, *supra*."

This court reiterates what it stated in Ramos v. United States, 319 F.Supp. 1207, 1217 (D.R.I.1970):

> "It may be said that Welsh posits upon the inferior courts a legal concept of religion that demands no basis or belief in God. It is now a *subjective test* virtually immune from attack, except in the narrow circumstances set forth by the Court:
>
>> 'The two groups of registrants which obviously do fall within these exclusions from the exemption are those whose beliefs are not deeply held and those whose objection to war does not rest at all upon moral, ethical, or religious principle but instead rests solely upon considerations of policy, pragmatism or expediency. 298 U.S. at 342–343, 90 S. Ct. at 1798'."

Applying the subjective test of *Welsh* it can hardly be denied that John Fargnoli does satisfy *Welsh*'s criteria and

does not fit within the exclusions recognized in *Ramos.*

Not meaning to be injudiciously abrupt I summarily conclude—the facts more than fairly preponderate in the defendant's favor. It appears to me that there is no need for an analysis of the defendant's beliefs as herein set forth, supra. To do so would be a prolix exercise in semantics. It is self evident his objection is morally and ethically based as pronounced in *Welsh;* a credo which finds its ultimate maturation in life's experiences and study outside the framework of "religion" as required by *Seeger,* that is as stemming from "religious training and belief" in keeping with "a standard or accepted understanding of the meaning of religion in American society." There can be no other interpretation to the defendant's pronouncement.

The sincerity of his belief is manifest in the consequences he is willing to suffer rather than yield. Furthermore I find in his writings a dominant theme of sincerity from which evolves his total conviction for the sanctity of life, which must be treated as ". . . something sacred . . ." and which ". . . we cannot decide to take . . . can not assume the right to end . . ." As these words set forth his sincerity so too they cry his opposition to all war— for all wars violate this defendant's teachings.

The government's isolation of a paragraph of his letter to Reverend Gray does not dilute this position. To begin with it is a passage out of context that has no meaning apart from the whole. Furthermore this court finds the government's main reliance on this single utterance disregards the repeated holdings that personal self defense does not compromise a conscientious objector claim.

"Willingness to use force in self-defense, in defense of home and family, or in defense against immediate acts of aggressive violence toward other persons in the community, has not been regarded as inconsistent with a claim of conscientious objection to war as such. See, e. g., United States v. Haughton, 413 F.2d 736, 740–742 (9th Cir. 1969); United States v. Carroll, 398 F.2d 651, 655 (3d Cir. 1968). *But surely willingness to use force defensively in the personal situations mentioned is quite different from willingness to fight in some wars but not in others."* Gillette v. United States, 401 U.S. 437, 448, 91 S.Ct. 828, 835, 28 L.Ed.2d 168 (1971).

And, as the defense argues, an in futuro state of mind has little relevance to present objection to all wars—

"Somewhat more apposite to the instant situation are cases dealing with persons who oppose participating in all wars, but cannot say with complete certainty that their present convictions and existing state of mind are unalterable. See, e. g., United States v. Owen, 415 F.2d 383, 390 (CA8 1969). Unwillingness to deny the possibility of a change of mind, in some hypothetical future circumstances, may be no more than humble good sense, casting no doubt on the claimant's present sincerity of belief." Gillette v. United States, *supra,* 401 U.S. at 448, 91 S.Ct. at 835.

■ I find the defendant has met his burden of proof; that he qualifies for exemption under *Welsh* but not under *Seeger* and direct the entry of a judgment of acquittal for defendant John E. Fargnoli.

The defendant will prepare an order reflecting this finding.

### Findings of Fact

#### Joseph R. Fargnoli

Joseph Fargnoli, John's brother, refused induction on January 15, 1969. After that date he applied for conscientious objector status and submitted on two occasions the required Form 150's. Joseph stood trial with his brother, and for both of them, the *Welsh* decision came down after they had refused induction and before they stood trial.

As to Joseph the government now somewhat incongruously argues that he was a religious objector at the time he refused induction. Evidence as to what Joseph's beliefs were at the time he refused induction may be derived from the testimony of witnesses at his trial and hearing, the two Form 150's he submitted to his Board, and the attachments to these Forms.

Attached to a Form 150 submitted on January 8, 1971 was a college philosophy paper Joseph wrote in 1967 and entitled "Notes of a Young Conscience." The paper is excerpted below:

> " . . . in the good man's mind must be every question, including 'How should a man act if there is no God?' For he must pledge to himself never to be attracted to God in order to support his philosophy.
>
> . . . the good man will do best by himself if he is willing to accept the possibility that he may never resolve this question [of the existence of God].
>
> . . . he must decide that he will discover the truth about God through himself and through other things and persons, and not merely through words and formalizations.
>
> . . . his basic criteria for judging things and situations will be what he believes to be true—that man is the only thing which may have value, and therefore may be the only thing which is an end in itself—and he would consequently behold all things, all progress and new things, in the light of his most basic belief, that man, if anything, has dignity and worth as an independent entity.
>
> . . . if there is no God, then what he has done has been the best that a man can do with his life, that is, he has responded to the crux of human existence, man's joining with other men to fight death and make a true home for all men on a remote planet that means nothing to anyone save man himself."

U.S. Exhibit 1

The paper attempts to answer "What is a good man" if there should not be a God to give us precepts about goodness. A recurrent theme throughout the paper is the worth of a human life and the evilness of using or abusing other human beings.

In a final examination paper in a history course written on April 23, 1968, Joseph interprets some writings by Malcolm X in light of his own beliefs and plans. The paper is critical of a "hybrid," power-hungry Christianity, which it maintains exists in America today and "is intimately involved with racism in the United States." It is apparent that he means the organized Christian churches of this country when he refers to a "hybrid" Christianity:

> "Now we are in the eleventh hour of our culture. As white Christians, we have failed up to this point to truly embrace a universal, various and rich ethic, morality, spiritualism, call it what you like. We have ignored the true spiritual qualities and concepts of love and justice and in their place have substituted false gods, hypocrisy and bigotry."

After expressing deep concern about the war, the riots, and racism, Joseph wrote:

> "I hope, like Malcolm X, that we *are* in a post-Christian era if that means we are shedding our Cross-and-Sword style. Perhaps this results in a diluted Christianity; undoubtedly many of us suffer from a general lack of spiritualism just because we have rejected entire systems, many of these systems (Catholicism, Protestantism with all its sects) clearly possessing abundant spiritual riches. But many of us have managed to avoid a spiritual vacuum or a diluted ethic and at the same time allied our souls with a basic humanism, a humanism characterized by love, brotherhood, and a conscious international spirit."

Joseph goes on to explain in the paper that he has developed a "methodology" —obviously a personal ethical system—

and that through his "methodology" he has decided that he will not serve in the war, that he is prepared, if necessary, to go to jail, and that his faith in America will not allow him to go to Canada. He says that "this has been, with the exception of conversations with my wife and letter-correspondence with my brother, a totally private decision." This paper was written nine months before Joseph refused induction on January 15, 1969. From this paper, Joseph appears as a concerned young man, alienated from the organized Church but appreciative of some of its values as he attempts to define his own moral and ethical beliefs, guided by humanistic precepts.

Testimony by certain witnesses at trial and hearing establishes the defendant's character at the time he refused induction. Joseph's father-in-law, Mr. William Larson, testified that for as long as he had known Joseph, some six or seven years, Joseph had been

"a very deeply philosophical young man. He is the type of person, I think who always has to know why.

I think he is very serious about [his convictions]."

Mr. Larson called Joseph a very philosophical man, but not necessarily religious. Cynthia Cooper McCarter, who has known defendant for ten years, testified that he was thoroughly sincere in his convictions about the war, and that his beliefs were not "opposing" beliefs but deeper and more convincing. The sincerity of Joseph's beliefs were also strongly affirmed by Paul James Petrie, one of Joseph's college professors.

Because both of Joseph's Form 150's were filed after he refused induction, they do not provide direct evidence of what his convictions were on January 15, 1969, when he refused induction. However, from them the Court is able to draw certain inferences about the character of Joseph's beliefs at that time.

In the Form 150 filed on June 4, 1969, Joseph states that although he was raised as a Roman Catholic, that the source from which his ethical principles derived was his conviction that:

"every human being is an end within himself, a subject rather than an object, and therefore it is a subversion of human existence to ignore this by treating another human being as a means, as a tool, to some other end."

This, of course, is substantially the same conviction that was expressed in his 1967 philosophy paper. Accompanying this Form 150 was a letter to the Local Board from Joseph in which he gives the reasons he did not apply for C.O. status prior to refusing induction. Among other reasons, he gives:

"First, the Form 150 which I had read at that time, required my affirmation as to belief in a Supreme Being. This I did not feel I could conscientiously do."

The Form 150 stated that in high school Joseph wanted to enter the religious life but that he no longer considered himself a Roman Catholic and that:

"I think in my own personal history I have moved from a theocentric to an anthropocentric orientation in my search . . . for a genuine understanding of god and neighbor."

The Form goes on to talk about the numerous philosophy courses Joseph took in college (all before 1969), and their strong influence on his beliefs.

In the Form 150 filed on January 8, 1971, Joseph crossed out every reference to "religious training and belief" in the Form and in a preamble indicated the Form should be available to those with religious as well as non-religious beliefs alike. In his statement to the Board, Joseph said:

"I believe in Christ. I do not know if he is God, but I know he is *of* God."

He talked again about being raised as a Catholic and then said

"In fact, [my teachers and priests] morally educated too well, for at the age of 17, on the verge of entering the Seminary to become a candidate for the priesthood, I saw, in one illumi-

nating moment while I kneeled in the Confessional, the hoax, the sham, the farce that is organized religion. . . . My beliefs stem from all the Great Books I have read . . . I can say in good conscience that my beliefs stem, both indirectly and partially, from the great literary tracts of human history."

The rest of the Form contains more statements about Joseph's views. The government has produced no evidence to cast doubt on the sincerity or truthfulness of these statements.

### Conclusions of Law

#### Joseph Fargnoli

Considering the above evidence of Joseph's character and beliefs as of January 15, 1971, this Court must determine whether at that time a Selective Service board would have found him a conscientious objector under the then existing regulations. The standards then used by draft boards were set out earlier, but it would be well to reiterate:

> "The definition of 'religious training and belief' comports with a standard or accepted meaning of religion in American society . . . [and] was not intended to be inclusive of morals, or of devotion to public welfare, or of policy of government."

This Court finds that the fair preponderance of the evidence demonstrates that Joseph would not in January of 1969 have met the standards to qualify as a conscientious objector. First, although raised as a Catholic, Joseph had broken with the Church and scorned organized religion. Second, he went through considerable vacillation as to whether there was a God and the evidence implies that as of January of 1969

he did not believe in a Supreme Being. Third, as he himself said, his beliefs were not theistic in nature, but derived in large part from readings as to the nature of man. Fourth, the fairest characterization of his beliefs in January of 1969 is that they were moral and philosophical. Fifth, although Joseph characterized his beliefs as being humanistic, one would have to conclude his were "individual principles acquired on an individualized basis" rather than beliefs derived from "formal, organized worship or shared beliefs by a recognizable and cohesive group." *Welsh, supra*, at 353 of 398 U.S., at 1803 of 90 S.Ct. (J. Harlan, concurring)

Joseph's beliefs were not those that would standardly be called "religious" in this society. While Joseph may well have thought of his beliefs as being religious ones, they are so only in a very broad sense, and not in the narrower meaning given to the term "religious" by the Selective Service regulations prior to *Welsh*.

This finding in no way rests on the actual disposition of Joseph's Form 150's by the draft board. But it is interesting to note that Mr. Simonelli, the Chairman of the Local Board, in his testimony at a hearing before the trial court stated that Joseph's beliefs had a philosophical basis.

The Court also finds that Joseph's beliefs were sincerely held. There is no evidence to contradict this.[1] While his conscientious objection may not have been absolutely definite until the moment he refused induction, the basis for his objection is clearly foretold by his earlier statements of belief.

The next question is whether Joseph, at the time he refused induction, would

---

[1.] At the trial it came out that Joseph applied to the Air Force Officer Candidate Training School and was rejected for physical health reasons in February of 1968. Joseph testified that he knew when he applied that he could never be a combat pilot because of health reasons. The application to the Air Force O.C.S. does not seem inconsistent with the picture of Joseph as a man with evolving beliefs not absolutely defined into conscientious objection until later. I do not take it as a mark of insincerity but rather a reasonable reaction from a troubled young man who feels an obligation to his country.

have qualified as a conscientious objector under *Welsh* and the Selective Service regulations promulgated thereunder. The question then is whether Joseph's beliefs are deeply held and based on ethical or moral principles that impose upon him a duty of conscience to refrain from participating in any war at any time, and whether those beliefs occupied a place in his life parallel to that filled by God in a traditionally religious person. *Welsh, supra,* at 340, 90 S.Ct. 1792.

From what has already been said it can readily be concluded that Joseph's beliefs are deeply held, they hold a place in his life parallel to that place God holds in others' lives, and they are based on ethical and moral principles. It follows from Joseph's central principles that he

> "Cannot serve in the Military, the Armed Forces, because although I might be performing essentially neutral or 'good' acts in themselves, I know, or would know, that my actions are ultimately subordinate to and contributory towards the willful utilization of human beings to another end, specifically, the destruction of yet other human beings." Form 150, June 4, 1969

Testimony of witnesses at trial also substantiated that prior to January 1969 Joseph was firmly opposed to all wars.

Joseph dealt with the question of whether he was a selective C.O. on the Form 150 in the following manner:

> "However, if it were possible, and I do have a difficult time imagining such an occurrence, that one opponent, namely my country, were to respond in a defensive fashion, without employing the 'methodical and deliberate capturing and destroying of enemy personnel and equipment, etc.' to an aggressor who's actions were unprovoked, then I could participate on the side of my country. But since such an occurrence is impossible, then I can say I am opposed to any war that is most likely to occur in the future."

This expression is similar to his brother's reservation set forth earlier and the same principles of law apply. This future state of mind premised on unlikely and hypothetical circumstances has little relevance to the sincerity of Joseph's present opposition to all wars. Gillette v. United States, *supra,* 401 U.S. at 448, 91 S.Ct. 828. The fair preponderance of the evidence leads to the conclusion that Joseph's beliefs impose upon him a duty to refrain from participating in any war at any time. Joseph, at the time he refused induction, met the standards for conscientious objection under *Welsh.* Therefore, this Court directs entry of a judgment of acquittal for defendant Joseph R. Fargnoli, Jr.

