# GILLETTE v. UNITED STATES

No. 85.  Argued December 9, 1970—Decided March 8, 1971*

---

*Together with No. 325, *Negre* v. *Larsen et al.,* on certiorari to the United States Court of Appeals for the Ninth Circuit.

MARSHALL, J., delivered the opinion of the Court, in which BURGER, C. J., and HARLAN, BRENNAN, STEWART, WHITE, and BLACKMUN, JJ., joined. BLACK, J., concurred in the judgment and in Part I of the Court's opinion. DOUGLAS, J., filed dissenting opinions, *post,* p. 463 and p. 470.

*Conrad J. Lynn* argued the cause for petitioner in No. 85. With him on the brief were *Leon Friedman, Marvin M. Karpatkin,* and *Melvin L. Wulf. Richard Harrington* argued the cause for petitioner in No. 325. With him on the briefs were *Leigh Athearn, Stuart J. Land,* and *John T. Noonan, Jr.*

*Solicitor General Griswold* argued the cause for the United States and for the other respondents in both cases. With him on the briefs were *Assistant Attorney General Wilson* and *Beatrice Rosenberg.*

*George T. Altman, pro se,* filed a brief as *amicus curiae* in both cases. *Leo Rosen* filed a brief for the American Ethical Union as *amicus curiae* in No. 85. Briefs of *amici curiae* in No. 325 were filed by *Charles H. Tuttle* and *Thomas A. Shaw, Jr.,* for the National Council of the Churches of Christ in the U. S. A. et al.; by *Peter J. Donnici* for the Executive Board of the National Federation of Priests' Councils; by *Joseph B. Robison, Ephraim Margolin, Stanley J. Friedman, Seymour Farber,* and *Edwin J. Lukas* for the American Jewish Congress; by *Michael N. Pollet* and *Elsbeth Levy Bothe* for Louis P. Font; and by the American Friends Service Committee.

MR. JUSTICE MARSHALL delivered the opinion of the Court.

These cases present the question whether conscientious objection to a particular war, rather than objection to war as such, relieves the objector from responsibilities of military training and service. Specifically, we are called upon to decide whether conscientious scruples relating to a particular conflict are within the purview of established provisions [1] relieving conscientious objectors to war from military service. Both petitioners also invoke constitutional principles barring government interference with the exercise of religion and requiring governmental neutrality in matters of religion.

In No. 85, petitioner Gillette was convicted of wilful failure to report for induction into the armed forces. Gillette defended on the ground that he should have been ruled exempt from induction as a conscientious objector to war. In support of his unsuccessful request for classification as a conscientious objector, this petitioner had stated his willingness to participate in a war of national defense or a war sponsored by the United Nations as a peace-keeping measure, but declared his opposition to American military operations in Vietnam, which he characterized as "unjust." Petitioner concluded that he could not in conscience enter and serve in the armed forces during the period of the Vietnam conflict. Gillette's view of his duty to abstain from any involvement in a war seen as unjust is, in his words, "based on a humanist approach to religion," and his personal decision concerning military service was guided by fundamental principles of conscience and deeply held views about the purpose and obligation of human existence.

---

[1] The relevant provisions are set down *infra*, at nn. 4, 5, and 6, and at accompanying text.

The District Court determined that there was a basis in fact to support administrative denial of exemption in Gillette's case. The denial of exemption was upheld, and Gillette's defense to the criminal charge rejected, not because of doubt about the sincerity or the religious character of petitioner's objection to military service, but because his objection ran to a particular war. In affirming the conviction, the Court of Appeals concluded that Gillette's conscientious beliefs "were specifically directed against the war in Vietnam," while the relevant exemption provision of the Military Selective Service Act of 1967, 50 U. S. C. App. § 456 (j) (1964 ed., Supp. V), "requires opposition 'to participation in war in any form.'" 420 F. 2d 298, 299–300 (CA2 1970).

In No. 325, petitioner Negre, after induction into the Army, completion of basic training, and receipt of orders for Vietnam duty, commenced proceedings looking to his discharge as a conscientious objector to war. Application for discharge was denied, and Negre sought judicial relief by habeas corpus. The District Court found a basis in fact for the Army's rejection of petitioner's application for discharge. Habeas relief was denied, and the denial was affirmed on appeal, because, in the language of the Court of Appeals, Negre "objects to the war in Vietnam, not to all wars," and therefore does "not qualify for separation [from the Army], as a conscientious objector."[2] 418 F. 2d 908, 909–910 (CA9 1969). Again, no question is raised as to the sincerity or the religious quality of this petitioner's views. In line with religious counseling and numerous religious texts, Negre,

---

[2] Since petitioner Negre is no longer on active duty in the Army, the dispute in No. 325 lacks the same intensity that was present at the time that Negre commenced his habeas action. However, some possibility of Vietnam duty apparently remains, and the Government seems to concede that the case has not been mooted. We therefore pursue the matter no further.

a devout Catholic, believes that it is his duty as a faithful Catholic to discriminate between "just" and "unjust" wars, and to forswear participation in the latter. His assessment of the Vietnam conflict as an unjust war became clear in his mind after completion of infantry training, and Negre is now firmly of the view that any personal involvement in that war would contravene his conscience and "all that I had been taught in my religious training."

We granted certiorari in these cases, 399 U. S. 925 (1970), in order to resolve vital issues concerning the exercise of congressional power to raise and support armies, as affected by the religious guarantees of the First Amendment. We affirm the judgments below in both cases.

## I

Each petitioner claims a nonconstitutional right to be relieved of the duty of military service in virtue of his conscientious scruples.[3] Both claims turn on the proper construction of § 6 (j) of the Military Selective Service Act of 1967, 50 U. S. C. App. § 456 (j) (1964 ed., Supp. V), which provides:

> "Nothing contained in this title . . . shall be construed to require any person to be subject to combatant training and service in the armed forces of the United States who, by reason of religious training and belief, is conscientiously opposed to participation in war in any form." [4]

------

[3] Both petitioners asked to be spared all military responsibilities because of their objections to the Vietnam conflict—Gillette sought exemption from the draft; Negre sought discharge from the Army.

[4] Section 6 (j) provides further:

"As used in this subsection, the term 'religious training and belief' does not include essentially political, sociological, or philosophical views, or a merely personal moral code. Any person claiming exemp-

This language controls Gillette's claim to exemption, which was asserted administratively prior to the point of induction. Department of Defense Directive No. 1300.6 (May 10, 1968), prescribes that post-induction claims to conscientious objector status shall be honored, if valid, by the various branches of the armed forces.[5] Section 6 (j) of the Act, as construed by the courts, is incorporated by the various service regulations issued pursuant to the Directive,[6] and thus the standards for measuring claims of in-service objectors, such as Negre, are the same as the statutory tests applicable in a pre-induction situation.

tion from combatant training and service because of such conscientious objections whose claim is sustained by the local board shall, if he is inducted into the armed forces . . . , be assigned to noncombatant service as defined by the President, or shall, if he is found to be conscientiously opposed to participation in such noncombatant service, in lieu of such induction, be ordered . . . to perform . . . civilian work contributing to the maintenance of the national health, safety, or interest . . . ."

[5] The Directive states:

"IV. A. *National Policy.* [T]he Congress . . . has deemed it more essential to respect a man's religious beliefs than to force him to serve in the Armed Forces and accordingly has provided that a person having bona fide religious objection to participation in war in any form . . . shall not be inducted into the Armed Forces . . . .

"IV. B. *DoD Policy.* Consistent with this national policy, bona fide conscientious objection . . . by persons who are members of the Armed Forces will be recognized to the extent practicable and equitable. Objection to a particular war will not be recognized."

[6] DOD Directive No. 1300.6 itself states:

"Since it is in the national interest to judge all claims of conscientious objection by the same standards, whether made before or after entering military service, Selective Service System standards used in determining [conscientious objector status] of draft registrants prior to induction shall apply to servicemen who claim conscientious objection after entering military service."

See also, *e. g.*, Army Regulations AR 635–20 (July 31, 1970), and AR 135–25 (Sept. 2, 1970).

For purposes of determining the statutory status of conscientious objection to a particular war, the focal language of § 6 (j) is the phrase, "conscientiously opposed to participation in war in any form." This language, on a straightforward reading, can bear but one meaning; that conscientious scruples relating to war and military service must amount to conscientious opposition to participating personally in any war and all war. See *Welsh* v. *United States*, 398 U. S. 333, 340, 342 (1970); *id.*, at 347, 357 (concurring in result). See also *United States* v. *Kauten*, 133 F. 2d 703, 707 (CA2 1943). It matters little for present purposes whether the words, "in any form," are read to modify "war" or "participation." On the first reading, conscientious scruples must implicate "war in any form," and an objection involving a particular war rather than all war would plainly not be covered by § 6 (j). On the other reading, an objector must oppose "participation in war." It would strain good sense to read this phrase otherwise than to mean "participation in all war." For the word "war" would still be used in an unqualified, generic sense, meaning war as such. Thus, however the statutory clause be parsed, it remains that conscientious objection must run to war in any form.[7]

A different result cannot be supported by reliance on the materials of legislative history.[8] Petitioners and

---

[7] Moreover, a reading that attaches the words "in any form" to "participation," rather than to "war," would render § 6 (j) somewhat incoherent. For that section itself allows a person having the specified conscientious scruples to be assigned to noncombatant service in the armed forces, if he is not "found to be conscientiously opposed to participation in such noncombatant service." See n. 4, *supra*. In short, Congress had in mind that conscientious scruples should be honored if they implicate opposition to "war in any form," even though the objector may not be averse to a noncombatant form of "participation."

[8] The roots of § 6 (j) may be found in the earliest period of American history. See generally Selective Service System Monograph No. 11, Conscientious Objection 29–38 (1950). In 1775 the

*amici* point to no episode or pronouncement in the legislative history of § 6 (j), or of predecessor provisions, that tends to overthrow the obvious interpretation of the words themselves.[9]

___

Continental Congress announced its resolve to respect the beliefs of "people who from Religious Principles cannot bear Arms in any case . . . ." *Id.,* at 33–34. Against a background of state constitutional and statutory law exempting conscientious objectors from militia service, see *United States* v. *Seeger,* 380 U. S. 163, 170–171 (1965), Congress in 1864 explicitly exempted from the federal draft persons who "are conscientiously opposed to the bearing of arms, and who are prohibited from doing so by the rules and articles of faith [of their] religious denominations." 13 Stat. 9. The Draft Act of 1917 relieved from military service any person who belonged to "any well-recognized religious sect or organization . . . whose existing creed or principles forbid its members to participate in war in any form and whose religious convictions are against war or participation therein . . . ." 40 Stat. 78. The Senate rejected an amendment to the 1917 legislation that would have granted exemptions "[o]n the ground of a conscientious objection to the undertaking of combatant service in the present war." 55 Cong. Rec. 1478. Subsequent exemption clauses have eliminated any restriction in terms of sectarian affiliation, and have made the exemption broadly available to any conscientious objector whose scruples concerning participation in war are grounded in "religious training and belief." Selective Training and Service Act of 1940, § 5 (g), 54 Stat. 889. But the phrase "participation in war in any form," used in the 1917 enactment, has, of course, survived the various revisions of the exempting provision.

[9] Petitioners' sole argument having specific reference to the legislative materials is utterly flawed. It runs as follows: the 1948 revision of the exempting provision was inspired in part by the dissent of Chief Justice Hughes in *United States* v. *Macintosh,* 283 U. S. 605 (1931); *Macintosh* involved a claimant whose conscientious scruples implicated only "unjust" wars, and the dissent remarked that "eminent statesmen here and abroad" have held such views, *id.,* at 635; thus Congress cannot fairly be deemed to have excluded objectors to particular wars from the 1948 exempting provision, predecessor to the present § 6 (j). However, the very most that can be said about congressional reliance on the *Macintosh* dissent is that Congress used it in fashioning a definition of the words "religious train-

It is true that the legislative materials reveal a deep concern for the situation of conscientious objectors to war, who absent special status would be put to a hard choice between .contravening imperatives of religion and conscience or suffering penalties. Moreover, there are clear indications that congressional reluctance to impose such a choice stems from a recognition of the value of conscientious action to the democratic community at large, and from respect for the general proposition that fundamental principles of conscience and religious duty may sometimes override the demands of the secular state. See *United States* v. *Seeger,* 380 U. S. 163, 170–172 (1965); *United States* v. *Macintosh,* 283 U. S. 605, 631–634 (1931) (dissenting opinion). See generally Selective Service System Monograph No. 11, Conscientious Objection (1950). But there are countervailing considerations, which are also the concern of Congress,[10] and the legislative materials simply do not support the view that Congress intended to recognize any conscientious claim whatever as a basis for relieving the claimant from the general responsibility or the various incidents of military service. The claim that is recognized by § 6 (j) is a

---

ing and belief." See *United States* v. *Seeger,* 380 U. S., at 172–179. The language of the exempting provision that is relevant to the present dispute—"participation in war in any form"—was not altered in 1948 or thereafter. Moreover, the *Macintosh* dissent does not itself suggest that conscientious objection to a particular war is or has ever been a basis for relief from military service. The claimant in *Macintosh* did not seek relief from military service— his contention, and that of the dissent, was that conscientious unwillingness to bear arms is not a disqualifying factor, under the language of the applicable loyalty oath, in a naturalization proceeding. (The argument of the dissent was later adopted by the Court in *Girouard* v. *United States,* 328 U. S. 61, 64 (1946).)

[10] See *infra,* at 454–460. See generally Report of the National Advisory Commission on Selective Service, In Pursuit of Equity: Who Serves When Not All Serve? 50–51 (1967).

claim of conscience running against war as such. This claim, not one involving opposition to a particular war only, was plainly the focus of congressional concern.

Finding little comfort in the wording or the legislative history of § 6 (j), petitioners rely heavily on dicta in the decisional law dealing with objectors whose conscientious scruples ran against war as such, but who indicated certain reservations of an abstract nature. It is instructive that none of the cases relied upon embraces an interpretation of § 6 (j) at variance with the construction we adopt today.[11]

*Sicurella* v. *United States,* 348 U. S. 385 (1955), presented the only previous occasion for this Court to focus on the "participation in war in any form" language of § 6 (j). In *Sicurella* a Jehovah's Witness who opposed participation in secular wars was held to possess the requisite conscientious scruples concerning war, although he was not opposed to participation in a "theocratic war" commanded by Jehovah. The Court noted that the "theocratic war" reservation was highly abstract—no such war had occurred since biblical times, and none was contemplated. Congress, on the other hand, had in mind "real shooting wars," *id.,* at 391, and Sicurella's abstract reservations did not undercut his conscientious opposition to participating in such wars. Plainly, *Sicurella* cannot be read to support the claims of those, like petitioners,

---

[11] Perhaps more significant is the fact that even lower courts that have granted relief to claimants who object to particular wars, have done so on constitutional, not statutory, grounds, and have found § 6 (j) defective because it does not admit of such relief. See, *e. g., United States* v. *McFadden,* 309 F. Supp. 502 (ND Cal. 1970), app. docketed, No. 422, O. T. 1970; *United States* v. *Sisson,* 297 F. Supp. 902 (Mass. 1969), appeal dismissed for want of jurisdiction, 399 U. S. 267 (1970). Since we conclude that § 6 (j), interpreted in the obvious way, suffers no constitutional infirmity, there is no temptation to expand its intended scope by constructional fiat in order to "save" it.

who for a variety of reasons consider one particular "real shooting war" to be unjust, and therefore oppose participation in that war.[12]

It should be emphasized that our cases explicating the "religious training and belief" clause of § 6 (j), or cognate clauses of predecessor provisions, are not relevant to the present issue. The question here is not whether these petitioners' beliefs concerning war are "religious" in nature. Thus, petitioners' reliance on *United States* v. *Seeger*, 380 U. S. 163, and *Welsh* v. *United States*, 398 U. S. 333, is misplaced. Nor do we decide that conscientious objection to a particular war necessarily falls within § 6 (j)'s expressly excluded class[13] of "essentially political, sociological, or philosophical views, or a merely personal moral code." Rather, we hold that Congress intended to exempt persons who oppose participating in all war—"participation in war in any form"— and that persons who object solely to participation in a particular war are not within the purview of the exempting section, even though the latter objection may have such roots in a claimant's conscience and personality that it is "religious" in character.

A further word may be said to clarify our statutory holding. Apart from abstract theological reservations, two other sorts of reservations concerning use of force have been thought by lower courts not to defeat a con-

---

[12] After noting that Sicurella's faith involved willingness to engage in theocratic conflict, though "without carnal weapons," the Court stated: "The test is not whether the registrant is opposed to all war, but whether he is opposed . . . to *participation* in war." 348 U. S., at 390. The plain purport of this statement is that opposition to theocratic war is not exacted, since Congress quite reasonably considered participation in "real shooting wars" to be the only sort of participation at stake. See also *Taffs* v. *United States*, 208 F. 2d 329, 331 (CA8 1953), cert. denied, 347 U. S. 928 (1954).

[13] See n. 4, *supra*.

scientious objector claim. Willingness to use force in self-defense, in defense of home and family, or in defense against immediate acts of aggressive violence toward other persons in the community, has not been regarded as inconsistent with a claim of conscientious objection to war as such. See, *e. g., United States* v. *Haughton,* 413 F. 2d 736, 740–742 (CA9 1969); *United States* v. *Carroll,* 398 F. 2d 651, 655 (CA3 1968). But surely willingness to use force defensively in the personal situations mentioned is quite different from willingness to fight in some wars but not in others. Cf. *Sicurella* v. *United States,* 348 U. S., at 389. Somewhat more apposite to the instant situation are cases dealing with persons who oppose participating in all wars, but cannot say with complete certainty that their present convictions and existing state of mind are unalterable. See, *e. g., United States* v. *Owen,* 415 F. 2d 383, 390 (CA8 1969). Unwillingness to deny the possibility of a change of mind, in some hypothetical future circumstances, may be no more than humble good sense, casting no doubt on the claimant's present sincerity of belief. At any rate there is an obvious difference between present sincere objection to all war, and present opposition to participation in a particular conflict only.

## II

Both petitioners argue that § 6 (j), construed to cover only objectors to all war, violates the religious clauses of the First Amendment. The First Amendment provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ." Petitioners contend that Congress interferes with free exercise of religion by failing to relieve objectors to a particular war from military service, when the objection is religious or conscientious in nature. While the two religious clauses—pertaining to "free exercise" and

"establishment" of religion—overlap and interact in many ways, see *Abington School District* v. *Schempp*, 374 U. S. 203, 222–223 (1963); Freund, Public Aid To Parochial Schools, 82 Harv. L. Rev. 1680, 1684 (1969), it is best to focus first on petitioners' other contention, that § 6 (j) is a law respecting the establishment of religion. For despite free exercise overtones, the gist of the constitutional complaint is that § 6 (j) impermissibly discriminates among types of religious belief and affiliation.[14]

On the assumption that these petitioners' beliefs concerning war have roots that are "religious" in nature, within the meaning of the Amendment as well as this Court's decisions construing § 6 (j), petitioners ask how their claims to relief from military service can be permitted to fail, while other "religious" claims are upheld by the Act. It is a fact that § 6 (j), properly construed, has this effect. Yet we cannot conclude in mechanical fashion, or at all, that the section works an establishment of religion.

An attack founded on disparate treatment of "religious" claims invokes what is perhaps the central purpose of the Establishment Clause—the purpose of ensuring governmental neutrality in matters of religion. See *Epperson* v. *Arkansas*, 393 U. S. 97, 103–104 (1968); *Everson* v. *Board of Education*, 330 U. S. 1, 15–16 (1947). Here

---

[14] Petitioners also assert that the Fifth Amendment's Due Process Clause is violated, because the distinction embodied in § 6 (j)—between objectors to all war and objectors to particular wars—is arbitrary and capricious and works an invidious discrimination in contravention of the "equal protection" principles encompassed by the Fifth Amendment. Cf. *Bolling* v. *Sharpe*, 347 U. S. 497, 499 (1954). This is not an independent argument in the context of these cases. Cf. *Walz* v. *Tax Commission*, 397 U. S. 664, 696 (1970) (opinion of HARLAN, J.). We hold that the section survives the Establishment Clause because there are neutral, secular reasons to justify the line that Congress has drawn, and it follows as a more general matter that the line is neither arbitrary nor invidious.

there is no claim that exempting conscientious objectors to war amounts to an overreaching of secular purposes and an undue involvement of government in affairs of religion. Cf. *Walz* v. *Tax Commission,* 397 U. S. 664, 675 (1970); *id.,* at 695 (opinion of HARLAN, J.). To the contrary, petitioners ask for greater "entanglement" by judicial expansion of the exemption to cover objectors to particular wars. Necessarily the constitutional value at issue is "neutrality." And as a general matter it is surely true that the Establishment Clause prohibits government from abandoning secular purposes in order to put an imprimatur on one religion, or on religion as such, or to favor the adherents of any sect or religious organization. See *Engel* v. *Vitale,* 370 U. S. 421, 430–431 (1962); *Torcaso* v. *Watkins,* 367 U. S. 488, 495 (1961). The metaphor of a "wall" or impassable barrier between Church and State, taken too literally, may mislead constitutional analysis, see *Walz* v. *Tax Commission, supra,* at 668–669; *Zorach* v. *Clauson,* 343 U. S. 306, 312–313 (1952), but the Establishment Clause stands at least for the proposition that when government activities touch on the religious sphere, they must be secular in purpose, evenhanded in operation, and neutral in primary impact. *Abington School District* v. *Schempp,* 374 U. S., at 222; *id.,* at 231 (BRENNAN, J., concurring); *id.,* at 305 (Goldberg, J., concurring).

## A

The critical weakness of petitioners' establishment claim arises from the fact that § 6 (j), on its face, simply does not discriminate on the basis of religious affiliation or religious belief, apart of course from beliefs concerning war. The section says that anyone who is conscientiously opposed to all war shall be relieved of military service. The specified objection must have a grounding in "religious training and belief," but no par-

ticular sectarian affiliation or theological position is required. The Draft Act of 1917, § 4, 40 Stat. 78, extended relief only to those conscientious objectors affiliated with some "well-recognized religious sect or organization" whose principles forbade members' participation in war, but the attempt to focus on particular sects apparently broke down in administrative practice, *Welsh* v. *United States,* 398 U. S., at 367 n. 19 (concurring in result), and the 1940 Selective Training and Service Act, § 5 (g), 54 Stat. 889, discarded all sectarian restriction.[15] Thereafter Congress has framed the conscientious objector exemption in broad terms compatible with "its long-established policy of not picking and choosing among religious beliefs." *United States* v. *Seeger,* 380 U. S., at 175.

Thus, there is no occasion to consider the claim that when Congress grants a benefit expressly to adherents of one *religion,* courts must either nullify the grant or somehow extend the benefit to cover all religions. For § 6 (j) does not single out any religious organization or religious creed for special treatment. Rather petitioners' contention is that since Congress has recognized one sort of conscientious objection concerning war, whatever its religious basis, the Establishment Clause commands that another, different objection be carved out and protected by the courts.[16]

Properly phrased, petitioners' contention is that the special statutory status accorded conscientious objection to all war, but not objection to a particular war, works

---

[15] See n. 8, *supra.*

[16] Since we hold that the "participation in war in any form" clause of § 6 (j) does not violate the First Amendment, there is little point in dealing with the problems that would be involved in deciding whether invalidity of the restrictive clause should lead to judicial nullification of the exemption *in toto* or judicial expansion to cure "underinclusiveness."

a de facto discrimination among religions. This happens, say petitioners, because some religious faiths themselves distinguish between personal participation in "just" and in "unjust" wars, commending the former and forbidding the latter, and therefore adherents of some religious faiths—and individuals whose personal beliefs of a religious nature include the distinction—cannot object to all wars consistently with what is regarded as the true imperative of conscience. Of course, this contention of de facto religious discrimination, rendering § 6 (j) fatally underinclusive, cannot simply be brushed aside. The question of governmental neutrality is not concluded by the observation that § 6 (j) on its face makes no discrimination between religions, for the Establishment Clause forbids subtle departures from neutrality, "religious gerrymanders," as well as obvious abuses. *Walz* v. *Tax Commission,* 397 U. S., at 696 (opinion of HARLAN, J.). See also *Braunfeld* v. *Brown,* 366 U. S. 599, 607 (1961) (opinion of Warren, C. J.); *Illinois ex rel. McCollum* v. *Board of Education,* 333 U. S. 203, 213, 232 (1948) (opinion of Frankfurter, J.). Still a claimant alleging "gerrymander" must be able to show the absence of a neutral, secular basis for the lines government has drawn. See *Epperson* v. *Arkansas,* 393 U. S., at 107–109; *Board of Education* v. *Allen,* 392 U. S. 236, 248 (1968); *McGowan* v. *Maryland,* 366 U. S. 420, 442–444 (1961); *id.,* at 468 (separate opinion of Frankfurter, J.). For the reasons that follow, we believe that petitioners have failed to make the requisite showing with respect to § 6 (j).

Section 6 (j) serves a number of valid purposes having nothing to do with a design to foster or favor any sect, religion, or cluster of religions.[17] There are considera-

---

[17] The exemption provision of the Draft Act of 1917, § 4, 40 Stat. 78, was upheld in the *Selective Draft Law Cases,* 245 U. S. 366, 389–390 (1918), at an early stage in the development of First Amend-

tions of a pragmatic nature, such as the hopelessness of converting a sincere conscientious objector into an effective fighting man, *Welsh* v. *United States,* 398 U. S., at 369 (WHITE, J., dissenting), but no doubt the section reflects as well the view that "in the forum of conscience, duty to a moral power higher than the State has always been maintained." *United States* v. *Macintosh,* 283 U. S. 605, 633 (1931) (Hughes, C. J., dissenting). See *United States* v. *Seeger,* 380 U. S., at 170–172. We have noted that the legislative materials show congressional concern for the hard choice that conscription would impose on conscientious objectors to war, as well as respect for the value of conscientious action and for the principle of supremacy of conscience.[18]

Naturally the considerations just mentioned are affirmative in character, going to support the existence of an exemption rather than its restriction specifically to persons who object to all war. The point is that these affirmative purposes are neutral in the sense of the Establishment Clause. Quite apart from the question whether the Free Exercise Clause might require some sort of exemption,[19] it is hardly impermissible for Congress to attempt to accommodate free exercise values, in line with "our happy tradition" of "avoiding unnecessary clashes with the dictates of conscience." *United States* v. *Macintosh, supra,* at 634 (Hughes, C. J., dissenting). See *Abington School District* v. *Schempp,* 374 U. S., at 294–299 (BRENNAN, J., concurring); *id.,* at 306 (Goldberg, J., concurring); *id.,* at 309 (STEWART, J., dissent-

---

ment doctrine, against a constitutional attack apparently founded on both the Establishment and Free Exercise Clauses. A single sentence was devoted to the complainants' First Amendment argument, "because we think its unsoundness is too apparent to require us to do more." *Id.,* at 390.

[18] See *supra,* at 445–446.

[19] See n. 23, *infra.*

ing). See also *Welsh* v. *United States,* 398 U. S., at 370–373 (WHITE, J., dissenting). "Neutrality" in matters of religion is not inconsistent with "benevolence" by way of exemptions from onerous duties, *Walz* v. *Tax Commission,* 397 U. S., at 669, so long as an exemption is tailored broadly enough that it reflects valid secular purposes. In the draft area for 30 years the exempting provision has focused on individual conscientious belief, not on sectarian affiliation. The relevant individual belief is simply objection to all war, not adherence to any extraneous theological viewpoint. And while the objection must have roots in conscience and personality that are "religious" in nature, this requirement has never been construed to elevate conventional piety or religiosity of any kind above the imperatives of a personal faith.

In this state of affairs it is impossible to say that § 6 (j) intrudes upon "voluntarism" in religious life, see *id.,* at 694–696 (opinion of HARLAN, J.), or that the congressional purpose in enacting § 6 (j) is to promote or foster those religious organizations that traditionally have taught the duty to abstain from participation in any war. A claimant, seeking judicial protection for his own conscientious beliefs, would be hard put to argue that § 6 (j) encourages membership in putatively "favored" religious organizations, for the painful dilemma of the sincere conscientious objector arises precisely because he feels himself bound in conscience not to compromise his beliefs or affiliations.

### B

We conclude not only that the affirmative purposes underlying § 6 (j) are neutral and secular, but also that valid neutral reasons exist for limiting the exemption to objectors to all war, and that the section therefore cannot be said to reflect a religious preference.

Apart from the Government's need for manpower, perhaps the central interest involved in the administration of conscription laws is the interest in maintaining a fair system for determining "who serves when not all serve." [20] When the Government exacts so much, the importance of fair, evenhanded, and uniform decisionmaking is obviously intensified. The Government argues that the interest in fairness would be jeopardized by expansion of § 6 (j) to include conscientious objection to a particular war. The contention is that the claim to relief on account of such objection is intrinsically a claim of uncertain dimensions, and that granting the claim in theory would involve a real danger of erratic or even discriminatory decisionmaking in administrative practice.

A virtually limitless variety of beliefs are subsumable under the rubric, "objection to a particular war." [21] All the factors that might go into nonconscientious dissent from policy, also might appear as the concrete basis of an objection that has roots as well in conscience and religion. Indeed, over the realm of possible situations, opposition to a particular war may more likely be political and nonconscientious, than otherwise. See *United States* v. *Kauten*, 133 F. 2d, at 708. The difficulties of sort-

---

[20] The Report of the National Advisory Commission on Selective Service (1967) is aptly entitled In Pursuit of Equity: Who Serves When Not All Serve?

[21] Matters relevant to such an objection, as the papers in these cases show, are whether the purposes of the war are thought ultimately defensive and pacific, or otherwise; whether the conflict is legal, or its prosecution decided upon by legal means; whether the implements of war are used humanely, or whether certain weapons should be used at all. A war may be thought "just" or not depending on one's assessment of these factors and many more: the character of the foe, or of allies; the place the war is fought; the likelihood that a military clash will issue in benefits, of various kinds, enough to override the inevitable costs of the conflict. And so on.

ing the two, with a sure hand, are considerable. Moreover, the belief that a particular war at a particular time is unjust is by its nature changeable and subject to nullification by changing events. Since objection may fasten on any of an enormous number of variables, the claim is ultimately subjective, depending on the claimant's view of the facts in relation to his judgment that a given factor or congeries of factors colors the character of the war as a whole. In short, it is not at all obvious in theory what sorts of objections should be deemed sufficient to excuse an objector, and there is considerable force in the Government's contention that a program of excusing objectors to particular wars may be "impossible to conduct with any hope of reaching fair and consistent results . . . ." Brief 28.

For their part, petitioners make no attempt to provide a careful definition of the claim to exemption that they ask the courts to carve out and protect. They do not explain why objection to a particular conflict—much less an objection that focuses on a particular facet of a conflict—should excuse the objector from all military service whatever, even from military operations that are connected with the conflict at hand in remote or tenuous ways.[22] They suggest no solution to the problems arising from the fact that altered circumstances may quickly render the objection to military service moot.

To view the problem of fairness and evenhanded decisionmaking, in the present context, as merely a commonplace chore of weeding out "spurious claims," is to minimize substantial difficulties of real concern to a responsible legislative body. For example, under the petitioners' unarticulated scheme for exemption, an objector's claim to exemption might be based on some feature of a current conflict that most would regard as incidental,

---

[22] See n. 3, *supra*.

or might be predicated on a view of the facts that most would regard as mistaken. The particular complaint about the war may itself be "sincere," but it is difficult to know how to judge the "sincerity" of the objector's conclusion that the war *in toto* is unjust and that any personal involvement would contravene conscience and religion. To be sure we have ruled, in connection with § 6 (j), that "the 'truth' of a belief is not open to question"; rather, the question is whether the objector's beliefs are "truly held." *United States* v. *Seeger,* 380 U. S., at 185. See also *United States* v. *Ballard,* 322 U. S. 78 (1944). But we must also recognize that "sincerity" is a concept that can bear only so much adjudicative weight.

Ours is a Nation of enormous heterogeneity in respect of political views, moral codes, and religious persuasions. It does not bespeak an establishing of religion for Congress to forgo the enterprise of distinguishing those whose dissent has some conscientious basis from those who simply dissent. There is a danger that as between two would-be objectors, both having the same complaint against a war, that objector would succeed who is more articulate, better educated, or better counseled. There is even a danger of unintended religious discrimination—a danger that a claim's chances of success would be greater the more familiar or salient the claim's connection with conventional religiosity could be made to appear. At any rate, it is true that "the more discriminating and complicated the basis of classification for an exemption—even a neutral one—the greater the potential for state involvement" in determining the character of persons' beliefs and affiliations, thus "entangl[ing] government in difficult classifications of what is or is not religious," or what is or is not conscientious. *Walz* v. *Tax Commission,* 397 U. S., at 698–699 (opinion of

HARLAN, J.). Cf. *Presbyterian Church* v. *Mary Elizabeth Blue Hull Church*, 393 U. S. 440 (1969). While the danger of erratic decisionmaking unfortunately exists in any system of conscription that takes individual differences into account, no doubt the dangers would be enhanced if a conscientious objection of indeterminate scope were honored in theory.

In addition to the interest in fairness, the Government contends that neutral, secular reasons for the line drawn by § 6 (j)—between objection to all war and objection to a particular war—may be found in the nature of the conscientious claim that these petitioners assert. Opposition to a particular war, states the Government's brief, necessarily involves a judgment "that is political and particular," one "based on the same political, sociological and economic factors that the government necessarily considered" in deciding to engage in a particular conflict. Brief 24–26. Taken in a narrow sense, these considerations do not justify the distinction at issue, for however "political and particular" the judgment underlying objection to a particular war, the objection still might be rooted in religion and conscience, and although the factors underlying that objection were considered and rejected in the process of democratic decisionmaking, likewise the viewpoint of an objector to all war was no doubt considered and "necessarily" rejected as well. Nonetheless, it can be seen on a closer view that this line of analysis, conjoined with concern for fairness, does support the statutory distinction.

Tacit at least in the Government's view of the instant cases is the contention that the limits of § 6 (j) serve an overriding interest in protecting the integrity of democratic decisionmaking against claims to individual noncompliance. Despite emphasis on claims that have a "political and particular" component, the logic of the

contention is sweeping. Thus the "interest" invoked is highly problematical, for it would seem to justify governmental refusal to accord any breathing space whatever to noncompliant conduct inspired by imperatives of religion and conscience.

On the other hand, some have perceived a danger that exempting persons who dissent from a particular war, albeit on grounds of conscience and religion in part, would "open the doors to a general theory of selective disobedience to law" and jeopardize the binding quality of democratic decisions. Report of the National Advisory Commission on Selective Service, In Pursuit of Equity: Who Serves When Not All Serve? 50 (1967). See also *Hamilton* v. *Regents,* 293 U. S. 245, 268 (1934) (Cardozo, J., concurring). Other fields of legal obligation aside, it is undoubted that the nature of conscription, much less war itself, requires the personal desires and perhaps the dissenting views of those who must serve to be subordinated in some degree to the pursuit of public purposes. It is also true that opposition to a particular war does depend *inter alia* upon particularistic factual beliefs and policy assessments, beliefs and assessments that presumably were overridden by the government that decides to commit lives and resources to a trial of arms. Further, it is not unreasonable to suppose that some persons who are *not* prepared to assert a conscientious objection, and instead accept the hardships and risks of military service, may well agree at all points with the objector, yet conclude, as a matter of conscience, that they are personally bound by the decision of the democratic process. The fear of the National Advisory Commission on Selective Service, apparently, is that exemption of objectors to particular wars would weaken the resolve of those who otherwise would feel themselves bound to serve despite personal cost, uneasiness at the

prospect of violence, or even serious moral reservations or policy objections concerning the particular conflict.

We need not and do not adopt the view that a categorical, global "interest" in stifling individualistic claims to noncompliance, in respect of duties generally exacted, is the neutral and secular basis of § 6 (j). As is shown by the long history of the very provision under discussion, it is not inconsistent with orderly democratic government for individuals to be exempted by law, on account of special characteristics, from general duties of a burdensome nature. But real dangers—dangers of the kind feared by the Commission—might arise if an exemption were made available that in its nature could not be administered fairly and uniformly over the run of relevant fact situations. Should it be thought that those who go to war are chosen unfairly or capriciously, then a mood of bitterness and cynicism might corrode the spirit of public service and the values of willing performance of a citizen's duties that are the very heart of free government. In short, the considerations mentioned in the previous paragraph, when seen in conjunction with the central problem of fairness, are without question properly cognizable by Congress. In light of these valid concerns, we conclude that it is supportable for Congress to have decided that the objector to all war—to all killing in war—has a claim that is distinct enough and intense enough to justify special status, while the objector to a particular war does not.

Of course, we do not suggest that Congress would have acted irrationally or unreasonably had it decided to exempt those who object to particular wars. Our analysis of the policies of § 6 (j) is undertaken in order to determine the existence *vel non* of a neutral, secular justification for the lines Congress has drawn. We find that justifying reasons exist and therefore hold that the Establishment Clause is not violated.

## III

Petitioners' remaining contention is that Congress interferes with the free exercise of religion by conscripting persons who oppose a particular war on grounds of conscience and religion. Strictly viewed, this complaint does not implicate problems of comparative treatment of different sorts of objectors, but rather may be examined in some isolation from the circumstance that Congress has chosen to exempt those who conscientiously object to all war.[23] And our holding that § 6 (j) comports with the Establishment Clause does not automatically settle the present issue. For despite a general harmony of purpose between the two religious clauses of the First Amendment, the Free Exercise Clause no doubt has a reach of its own. *Abington School District* v. *Schempp,* 374 U. S., at 222–223.

Nonetheless, our analysis of § 6 (j) for Establishment Clause purposes has revealed governmental interests of a kind and weight sufficient to justify under the Free Exercise Clause the impact of the conscription laws on those who object to particular wars.

Our cases do not at their farthest reach support the proposition that a stance of conscientious opposition relieves an objector from any colliding duty fixed by a democratic government. See *Cantwell* v. *Connecticut,*

---

[23] We are not faced with the question whether the Free Exercise Clause itself would require exemption of any class other than objectors to particular wars. A free exercise claim on behalf of such objectors collides with the distinct governmental interests already discussed, and, at any rate, no other claim is presented. We note that the Court has previously suggested that relief for conscientious objectors is not mandated by the Constitution. See *Hamilton* v. *Regents,* 293 U. S. 245, 264 (1934); *United States* v. *Macintosh,* 283 U. S., at 623–624; cf. *In re Summers,* 325 U. S. 561, 572–573 (1945).

310 U. S. 296, 303–304 (1940); *Jacobson* v. *Massachusetts*, 197 U. S. 11, 29 (1905); cf. *Cleveland* v. *United States*, 329 U. S. 14, 20 (1946). To be sure, the Free Exercise Clause bars "governmental regulation of religious *beliefs as such*," *Sherbert* v. *Verner*, 374 U. S. 398, 402 (1963), or interference with the dissemination of religious ideas. See *Fowler* v. *Rhode Island*, 345 U. S. 67 (1953); *Follett* v. *McCormick*, 321 U. S. 573 (1944); *Murdock* v. *Pennsylvania*, 319 U. S. 105 (1943). It prohibits misuse of secular governmental programs "to impede the observance of one or all religions or . . . to discriminate invidiously between religions, . . . even though the burden may be characterized as being only indirect." *Braunfeld* v. *Brown*, 366 U. S., at 607 (opinion of Warren, C. J.). And even as to neutral prohibitory or regulatory laws having secular aims, the Free Exercise Clause may condemn certain applications clashing with imperatives of religion and conscience, when the burden on First Amendment values is not justifiable in terms of the Government's valid aims. See *id.; Sherbert* v. *Verner, supra*. See generally Clark, Guidelines for the Free Exercise Clause, 83 Harv. L. Rev. 327 (1969). However, the impact of conscription on objectors to particular wars is far from unjustified. The conscription laws, applied to such persons as to others, are not designed to interfere with any religious ritual or practice, and do not work a penalty against any theological position. The incidental burdens felt by persons in petitioners' position are strictly justified by substantial governmental interests that relate directly to the very impacts questioned. And more broadly, of course, there is the Government's interest in procuring the manpower necessary for military purposes, pursuant to the constitutional grant of power to Congress to raise and support armies. Art. I, § 8.

## IV

Since petitioners' statutory and constitutional claims to relief from military service are without merit, it follows that in Gillette's case (No. 85) there was a basis in fact to support administrative denial of exemption, and that in Negre's case (No. 325) there was a basis in fact to support the Army's denial of a discharge. Accordingly, the judgments below are

*Affirmed.*

MR. JUSTICE BLACK concurs in the Court's judgment and in Part I of the opinion of the Court.

MR. JUSTICE DOUGLAS, dissenting in No. 85.*

Gillette's objection is to combat service in the Vietnam war, not to wars in general, and the basis of his objection is his conscience. His objection does not put him into the statutory exemption which extends to one "who, by reason of religious training and belief, is conscientiously opposed to participation in war in any form." [1]

He stated his views as follows:

> "I object to any assignment in the United States Armed Forces while this unnecessary and unjust war is being waged, on the grounds of religious belief specifically 'Humanism.' This essentially means respect and love for man, faith in his inherent goodness and perfectability, and confidence in his capability to improve some of the pains of the human condition."

This position is substantially the same as that of Sisson in *United States* v. *Sisson,* 297 F. Supp. 902, ap-

---

*[For dissenting opinion of MR. JUSTICE DOUGLAS in No. 325, *Negre* v. *Larsen,* see *post,* p. 470.]

[1] Section 6 (j), Military Selective Service Act of 1967, 50 U. S. C. App. § 456 (j) (1964 ed., Supp. V).

peal dismissed, 399 U. S. 267, where the District Court summarized the draftee's position as follows:

"Sisson's table of ultimate values is moral and ethical. It reflects quite as real, pervasive, durable, and commendable a marshalling of priorities as a formal religion. It is just as much a residue of culture, early training, and beliefs shared by companions and family. What another derives from the discipline of a church, Sisson derives from the discipline of conscience." 297 F. Supp., at 905.

There is no doubt that the views of Gillette are sincere, genuine, and profound. The District Court in the present case faced squarely the issue presented in *Sisson* and being unable to distinguish the case on the facts, refused to follow *Sisson.*

The question, Can a conscientious objector, whether his objection be rooted in "religion" or in moral values, be required to kill? has never been answered by the Court.[2] *Hamilton* v. *Regents,* 293 U. S. 245, did no more than hold that the Fourteenth Amendment did not require a State to make its university available to one who would not take military training. *United States* v. *Macintosh,* 283 U. S. 605, denied naturalization to a person who "would not promise in advance to bear arms in defense of the United States unless he believed the war to be morally justified." *Id.,* at 613. The question of compelling a man to kill against his conscience was not squarely involved. Most of the talk in the majority opinion concerned "serving in the armed forces of the

[2] See T. Powell, Conscience and the Constitution, in Democracy and National Unity (W. Hutchison ed. 1941).

It is probably a universal truth that "the one thing which authority, whether political, social, religious or economic, tends instinctively to fear is the insistence of conscience." Mehta, The Conscience of a Nation or Studies in Gandhism p. ii (Calcutta, 1933).

Nation in time of war." *Id.*, at 623. Such service can, of course, take place in noncombatant roles. The ruling was that such service is "dependent upon the will of Congress and not upon the scruples of the individual, except as Congress provides." *Ibid.* The *dicta* of the Court in the *Macintosh* case squint towards the denial of Gillette's claim, though as I have said, the issue was not squarely presented.

Yet if dicta are to be our guide, my choice is the dicta of Chief Justice Hughes who, dissenting in *Macintosh*, spoke as well for Justices Holmes, Brandeis, and Stone:

> "Nor is there ground, in my opinion, for the exclusion of Professor Macintosh because his conscientious scruples have particular reference to wars believed to be unjust. There is nothing new in such an attitude. Among the most eminent statesmen here and abroad have been those who condemned the action of their country in entering into wars they thought to be unjustified. Agreements for the renunciation of war presuppose a preponderant public sentiment against wars of aggression. If, while recognizing the power of Congress, the mere holding of religious or conscientious scruples against all wars should not disqualify a citizen from holding office in this country, or an applicant otherwise qualified from being admitted to citizenship, there would seem to be no reason why a reservation of religious or conscientious objection to participation in wars believed to be unjust should constitute such a disqualification." *Id.*, at 635.

I think the Hughes view is the constitutional view. It is true that the First Amendment speaks of the free exercise of religion, not of the free exercise of conscience or belief. Yet conscience and belief are the main ingredients of First Amendment rights. They are the

bedrock of free speech as well as religion. The implied First Amendment right of "conscience" is certainly as high as the "right of association" which we recognized in *Shelton* v. *Tucker,* 364 U. S. 479, and *NAACP* v. *Alabama,* 357 U. S. 449. Some indeed have thought it higher.[3]

Conscience is often the echo of religious faith. But, as this case illustrates, it may also be the product of travail, meditation, or sudden revelation related to a moral comprehension of the dimensions of a problem, not to a religion in the ordinary sense.

Tolstoy[4] wrote of a man, one Van der Veer, "who, as he himself says, is not a Christian, and who refuses military service, not from religious motives, but from motives of the simplest kind, motives intelligible and common to all men, of whatever religion or nation, whether Catholic, Mohammedan, Buddhist, Confucian, whether Spaniards or Japanese.

> "Van der Veer refuses military service, not because he follows the commandment. 'Thou shalt do no murder,' not because he is a Christian, but because he holds murder to be opposed to human nature."

---

[3] See M. Konvitz, Religious Liberty and Conscience 106 (1968); Redlich & Feinberg, Individual Conscience and the Selective Service Objector: The Right Not to Kill, 44 N. Y. U. L. Rev. 875, 891 (1969): "Free expression and the right of personal conscientious belief are closely intertwined. At the core of the first amendment's protection of individual expression, is the recognition that such expression represents the oral or written manifestation of conscience. The performance of certain acts, under certain circumstances, involves such a crisis of conscience as to invoke the protection which the first amendment provides for similar manifestations of conscience when expressed in verbal or written expressions of thought. The most awesome act which any society can demand of a citizen's conscience is the taking of a human life."

[4] L. Tolstoy, Writings On Civil Disobedience and Non-Violence 12 (1967).

Tolstoy [5] goes on to say:

> "Van der Veer says he is not a Christian. But the motives of his refusal and action are Christian. He refuses because he does not wish to kill a brother man; he does not obey, because the commands of his conscience are more binding upon him than the commands of men. . . . Thereby he shows that Christianity is not a sect or creed which some may profess and others reject; but that it is naught else than a life's following of that light of reason which illumines all men. . . .
>
> "Those men who now behave rightly and reasonably do so, not because they follow prescriptions of Christ, but because that line of action which was pointed out eighteen hundred years ago has now become identified with human conscience."

The "sphere of intellect and spirit," as we described the domain of the First Amendment in *West Virginia Board of Education* v. *Barnette,* 319 U. S. 624, 642, was recognized in *United States* v. *Seeger,* 380 U. S. 163, where we gave a broad construction to the statutory exemption of those who by their religious training or belief are conscientiously opposed to participation in war in any form. We said: "A sincere and meaningful belief which occupies in the life of its possessor a place parallel to that filled by

---

[5] *Id.,* at 15–16. And see Clark, Guidelines for the Free Exercise Clause, 83 Harv. L. Rev. 327, 337 (1969):

"The argument is not merely that avoiding compulsion of a man's conscience produces the greatest good for the greatest number, but that such compulsion is itself unfair to the individual concerned. The moral condemnation implicit in the threat of criminal sanctions is likely to be very painful to one motivated by belief. Furthermore, the cost to a principled individual of failing to do his moral duty is generally severe, in terms of supernatural sanction or the loss of moral self-respect."

the God of those admittedly qualifying for the exemption comes within the statutory definition." *Id.*, at 176.[6]

*Seeger* does not answer the present question as Gillette is not "opposed to participation in war in any form."

But the constitutional infirmity in the present Act seems obvious once "conscience" is the guide. As Chief Justice Hughes said in the *Macintosh* case:

> "But, in the forum of conscience, duty to a moral power higher than the State has always been maintained. The reservation of that supreme obligation, as a matter of principle, would unquestionably be made by many of our conscientious and law-abiding citizens. The essence of religion is belief in a relation to God involving duties superior to those arising from any human relation." 283 U. S., at 633–634.

The law as written is a species of those which show an invidious discrimination in favor of religious persons and against others with like scruples. MR. JUSTICE BLACK once said: "The First Amendment has lost much if the religious follower and the atheist[7] are no longer to be

---

[6] In *Welsh* v. *United States*, 398 U. S. 333, four Justices elaborated on *Seeger*, stating:

"The Court [in *Seeger*] made it clear that these sincere and meaningful beliefs that prompt the registrant's objection to all wars need not be confined in either source or content to traditional or parochial concepts of religion. . . . What is necessary under *Seeger* for a registrant's conscientious objection to all war to be 'religious' within the meaning of § 6 (j) is that this opposition to war stem from the registrant's moral, ethical, or religious beliefs about what is right and wrong and that these beliefs be held with the strength of traditional religious convictions." *Id.*, at 339–340.

[7] Article VI of the Constitution provides that "no religious Test shall ever be required as a Qualification to any Office or public Trust under the United States." *Torcaso* v. *Watkins*, 367 U. S. 488, upheld the right of a nonbeliever to hold public office.

judicially regarded as entitled to equal justice under law." *Zorach* v. *Clauson,* 343 U. S. 306, 320 (dissenting). We said as much in our recent decision in *Epperson* v. *Arkansas,* 393 U. S. 97, where we struck down as unconstitutional a state law prohibiting the teaching of the doctrine of evolution in the public schools:

> "Government in our democracy, state and national, must be neutral in matters of religious theory, doctrine, and practice. It may not be hostile to any religion or to the advocacy of no-religion; and it may not aid, foster, or promote one religion or religious theory against another or even against the militant opposite. The First Amendment mandates governmental neutrality between religion and religion, and between religion and nonreligion." *Id.,* at 103–104.

While there is no Equal Protection Clause in the Fifth Amendment, our decisions are clear that invidious classifications violate due process. *Bolling* v. *Sharpe,* 347 U. S. 497, 500, held that segregation by race in the public schools was an invidious discrimination, and *Schneider* v. *Rusk,* 377 U. S. 163, 168–169, reached the same result based on penalties imposed on naturalized, not native-born, citizens. A classification of "conscience" based on a "religion" and a "conscience" based on more generalized, philosophical grounds is equally invidious by reason of our First Amendment standards.

I had assumed that the welfare of the single human soul was the ultimate test of the vitality of the First Amendment.

This is an appropriate occasion to give content to our dictum in *Board of Education* v. *Barnette, supra,* at 642:

> "[F]reedom to differ is not limited to things that do not matter much. . . . The test of its sub-

stance is the right to differ as to things that touch the heart of the existing order."

I would reverse this judgment.

MR. JUSTICE DOUGLAS, dissenting in No. 325, *Negre* v. *Larsen.*

I approach the facts of this case with some diffidence, as they involve doctrines of the Catholic Church in which I was not raised. But we have on one of petitioner's briefs an authoritative lay Catholic scholar, Dr. John T. Noonan, Jr., and from that brief I deduce the following:

Under the doctrines of the Catholic Church a person has a moral duty to take part in wars declared by his government so long as they comply with the tests of his church for just wars.[1] Conversely, a Catholic has a moral duty not to participate in unjust wars.[2]

---

[1] The theological basis for this was explained by Pope John XXIII in Part II of Pacem in Terris ¶ 46 (Paulist Press 1963): "Human society can be neither well-ordered nor prosperous unless it has some people invested with legitimate authority to preserve its institutions . . . . These however derive their authority from God, as St. Paul teaches in the words, *There exists no authority except from God.* These words of St. Paul are explained thus by St. John Chrysostom: . . . *What I say is, that it is the divine wisdom and not mere chance, that has ordained that there should be government, that some should command and others obey.*" ¶ 50 adds: "When, in fact, men obey their rulers, it is not at all as men that they obey them, but through their obedience it is God . . . since He has decreed that men's dealings with one another should be regulated by an order which He Himself has established."

[2] "Since the right to command is required by the moral order and has its source in God, it follows that, if civil authorities legislate for or allow anything that is contrary to that order and therefore contrary to the will of God, neither the laws made nor the authorizations granted can be binding on the consciences of the citizens, since *we must obey God rather than men.*" *Id.,* at ¶ 51.

The Fifth Commandment, "Thou shall not kill," provides a basis for the distinction between just and unjust wars. In the 16th century Francisco Victoria, Dominican master of the University of Salamanca and pioneer in international law, elaborated on the distinction. "If a subject is convinced of the injustice of a war, he ought not to serve in it, even on the command of his prince. This is clear, for no one can authorize the killing of an innocent person." He realized not all men had the information of the prince and his counsellors on the causes of a war, but where "the proofs and tokens of the injustice of the war may be such that ignorance would be no excuse even to the subjects" who are not normally informed, that ignorance will not be an excuse if they participate.[3] Well over 400 years later, today, the Baltimore Catechism makes an exception to the Fifth Commandment for a "soldier fighting a just war." [4]

No one can tell a Catholic that this or that war is either just or unjust. This is a personal decision that an individual must make on the basis of his own conscience after studying the facts.[5]

---

[3] De Indis Relectio Posterior, sive De Iure Belli Hispanorum in Barbaros, translated in Classics of International Law 173–174 (E. Nys ed. 1917).

[4] P. 205 (official rev. ed. 1949).

[5] Pope Paul VI in § 16 of the Pastoral Constitution on the Church in the Modern World states:

"Deep within his conscience man discovers a law which he has not laid upon himself but which he must obey. Its voice, ever calling him to love and to do what is good and avoid evil, tells him inwardly at the right moment to do this or to shun that. For man has in his heart a law inscribed by God. His dignity lies in observing this law, and by it he will be judged."

A. Fagothey, Right and Reason: Ethics in Theory and Practice 38 (4th ed. 1967) states: "Hence a certain conscience must be obeyed, not only when it is correct, but even when it is invincibly erroneous

Like the distinction between just and unjust wars, the duty to obey conscience is not a new doctrine in the Catholic Church. When told to stop preaching by the Sanhedrin, to which they were subordinate by law, "Peter and the apostles answered and said, 'We must obey God rather than men.' "[6] That duty has not changed. Pope Paul VI has expressed it as follows: "On his part, man perceives and acknowledges the imperatives of the divine law through the mediation of conscience. In all his activity a man is bound to follow his conscience, in order that he may come to God, the end and purpose of life."[7]

While the fact that the ultimate determination of whether a war is unjust rests on individual conscience, the Church has provided guides. Francisco Victoria referred to "killing of an innocent person." World War II had its impact on the doctrine. Writing shortly after the war Cardinal Ottaviani stated: "[M]odern wars can

---

[unrealized error]. Conscience is the only guide a man has for the performance of concrete actions here and now. But an invincibly erroneous conscience cannot be distinguished from a correct conscience. Therefore if one were not obliged to follow a certain but invincibly erroneous conscience, we should be forced to the absurd conclusions that one would not be obliged to follow a certain and correct conscience." On this matter § 16 of the Pastoral Constitution adds: "Yet it often happens that conscience goes astray through ignorance which it is unable to avoid, but under such circumstances it does not lose its dignity. This cannot be said of the man who takes little trouble to find out what is true and good."

[6] Acts 5:29 (Standard ed. 1900).

[7] Declaration on Religious Freedom I:3 in Documents of Vatican Council II, p. 369 (Newman Press 1966). See also "Human Life in Our Day" issued by the National Conference of Catholic Bishops (Nov. 15, 1968): "Whether or not such modifications in our laws are in fact made, we continue to hope that, in the all-important issue of war and peace, all men will follow their consciences. We can do no better than to recall, as did the Vatican Council, 'the permanent binding force of universal natural law and its all embracing principles,' to which 'man's conscience itself gives ever more emphatic voice.' "

never fulfil those conditions which (as we stated earlier on in this essay) govern—theoretically—a just and lawful war. Moreover, no conceivable cause could ever be sufficient justification for the evils, the slaughter, the destruction, the moral and religious upheavals which war today entails. *In practice, then, a declaration of war will never be justifiable."* [8] The full impact of the horrors of modern war were emphasized in the Pastoral Constitution announced by Vatican II:

> "The development of armaments by modern science has immeasurably magnified the horrors and wickedness of war. Warfare conducted with these weapons can inflict immense and indiscriminate havoc which goes far beyond the bounds of legitimate defense. Indeed, if the kind of weapons now stocked in the arsenals of the great powers were to be employed to the fullest, the result would be the almost complete reciprocal slaughter of one side by the other, not to speak of the widespread devastation that would follow in the world and the deadly after-effects resulting from the use of such arms.

> "All these factors force us to undertake a completely fresh reappraisal of war. . . ."

> "[I]t is one thing to wage a war of self-defense; it is quite another to seek to impose domination on another nation. . . ."

The Pastoral Constitution announced that "[e]very act of war directed to the indiscriminate destruction of whole cities or vast areas with their inhabitants is a crime against God and man which merits firm and unequivocal condemnation." [9]

Louis Negre is a devout Catholic. In 1951 when he was four, his family immigrated to this country from

---

[8] The Future of Offensive War, 30 Blackfriars 415, 419 (1949).
[9] Pastoral Constitution ¶¶ 79, 80.

France.[10]  He attended Catholic schools in Bakersfield, California, until graduation from high school.  Then he attended Bakersfield Junior College for two years.  Following that, he was inducted into the Army.

At the time of his induction he had his own convictions about the Vietnam war and the Army's goals in the war.  He wanted, however, to be sure of his convictions.  "I agreed to myself that before making any decision or taking any type of stand on the issue, I would permit myself to see and understand the Army's explanation of its reasons for violence in Vietnam.  For, without getting an insight on the subject, it would be unfair for me to say anything, without really knowing the answer." [11]

On completion of his advanced infantry training, "I knew that if I would permit myself to go to Vietnam I would be violating my own concepts of natural law and would be going against all that I had been taught in my religious training."  Negre applied for a discharge as a conscientious objector.  His application was denied.  He then refused to comply with an order to proceed for shipment to Vietnam.  A general court-martial followed, but he was acquitted.  After that he filed this application for discharge as a conscientious objector.

---

[10] Petitioner suggests that one of the reasons his parents left France was their opposition to France's participation in the Indo-China war.

[11] See n. 5, *supra*.  Fagothey, *supra*, n. 5, at 37 states: "What degree of certitude is required?  It is sufficient that the conscience be *prudentially certain*.  Prudential certitude is not absolute but relative.  It excludes all *prudent* fear that the opposite may be true, but it does not rule out imprudent fears based on bare possibilities.  The reasons are strong enough to satisfy a normally prudent man in an important matter, so that he feels safe in practice though there is a theoretical chance of his being wrong.  He has taken every reasonable precaution, but cannot guarantee against rare contingencies and freaks of nature."

Negre is opposed under his religious training and beliefs to participation in any form in the war in Vietnam. His sincerity is not questioned. His application for a discharge, however, was denied because his religious training and beliefs led him to oppose only a particular war [12] which according to his conscience was unjust.

For the reasons I have stated in my dissent in the *Gillette* case decided this day, I would reverse the judgment.

---

[12] "For those middle-aged people who find themselves baffled by the current widespread resistance to the draft, a Stanford University student has provided a useful parallel.

"Addressing a hearing of the Senate Armed Service Committee . . . , Peter Knutson said that 'If, during the course of the Second World War, America had entered on the side of Hitler's Germany, would you have allowed yourself to be drafted? Would you have blindly said my country right or wrong?'

"That is about as well as the anti-draft cause has ever been stated. . . .

"It may seem far-fetched to suppose that America ever would have fought on the side of Hitler, but that too is beside the point. If today's World War II veteran will try to imagine what he might have done had he been drafted under those circumstances, he will be able to understand some part of the dilemma that the Vietnam war has imposed on this generation of draftees. It has been a real dilemma breeding powerful frustrations, and its residues will long outlast the war."—L. H.—Lewiston (Ida.) Tribune.